STATE of Missouri, Appellant,

v.

Raymond E. WOOD, Respondent.

No. WD 63266.

Missouri Court of Appeals,
Western District.

March 23, 2004.

Mary A. Young, Warrensburg, MO, for
Appellant.

Thomas J. Jacquinot, Cynthia L. Short,
Kansas City, MO, for Respondent.

Before RONALD R. HOLLIGER, P.J.,
ROBERT G. ULRICH and JAMES M.
SMART, JJ.

ROBERT G. ULRICH, Judge.

This is an interlocutory appeal by the State of Missouri from the order of the trial court suppressing the statement given by Raymond Wood to law enforcement officials after his arrest for shooting his wife and their six children. Mr. Wood's wife and four of the children were killed; two of the children survived. The State contends that the trial court's finding of coercive police conduct was not supported by substantial evidence and was against the weight of the evidence. It further argues that the trial court misapplied the law in focusing on Mr. Wood's mental condition as a significant factor in determining the voluntariness of his statement. The order of the trial court is affirmed.

### Facts

On the morning of February 14, 2000, the Johnson County Sheriff's Department received a 911 call reporting a shooting at a rural Johnson County home. The caller, Carol Wood, Raymond Wood's mother, told the 911 dispatcher that her son had told her and his father that he had shot his family. Mrs. Wood also told the dispatcher that her son was mentally ill and had been on medications for a few days. Law enforcement officers responded to the home and found that Tina Wood and her six young children, Jared (10), Joshua (8), Emily (7), Hannah (5), Moriah (3), and Katlin (18 months), had been shot. Mrs. Wood and the four oldest children were dead. The two youngest children, although seriously injured, were alive. Raymond Wood was arrested at the scene and transported to the Johnson County jail at approximately 9:45 a.m. He was booked around noon.

At approximately 6:30 p.m., Mr. Wood was interviewed for approximately forty-five minutes by two members of the Sheriff's Department, Major Randy Vick and Detective Gary Klote. Detective Klote had never met Mr. Wood before that day. Major Vick was a personal friend of Mr. Wood's and a lay minister at his church. The officers wore plain clothes, not uniforms. Mr. Wood was introduced to Detective Klote and acknowledged that he knew Major Vick. The officers advised Mr. Wood that they wanted to speak with him as law enforcement officers. The officers then advised Mr. Wood of his *Miranda* rights and provided him a *Miranda* waiver form to sign. Mr. Wood acknowledged that he understood his rights, and he signed the waiver form agreeing to talk to the officers without an attorney present.

Major Vick then asked Mr. Wood what had happened. Mr. Wood calmly gave a recitation of the events of the morning. He explained that he shot his wife three times. Then, realizing that the children would suffer from losing their mother, he shot each child one time. Mr. Wood further stated that after shooting his family, he shot himself. Mr. Wood lifted his hair from his forehead, and the officers observed for the first time abrasions and gunpowder burns on his forehead.

During the course of the interview, Mr. Wood referred to the "turmoil" he had been experiencing in the days preceding the shootings, and he talked of the "snares" in his head and of "too many ensnaring thoughts." Toward the end of the interview, the officers asked Mr. Wood if he would give a written statement, but he declined. Mr. Wood's demeanor suddenly changed, the interview was terminated, and Mr. Wood was returned to his cell.

Two days later, on the morning of February 16, after an altercation at the jail between Mr. Wood and three jailers that resulted in Mr. Wood being restrained in a chair, the Sheriff's Department contacted Pathways Community Health Services in Warrensburg for a mental health evalua-

tion. As a result of the evaluation, Mr. Wood was involuntarily committed to a state mental hospital, a commitment that was continuing at the time of the suppression hearing.

In February 2003, Mr. Wood filed a motion to suppress the statement he gave law enforcement officials on the evening of his arrest. He argued, *inter alia,* that the statement was involuntary based on his history of mental illness; his mental illness exhibited on February 14, 2000; and the coercive conduct of the police in choosing an interrogator who, in addition to being a police officer, was Mr. Wood's minister and close personal friend.

A hearing was held on Mr. Wood's motion. Following the hearing, the trial court entered its order finding, *inter alia,* that Mr. Wood's February 14, 2000, statement was involuntary based on the use of coercive governmental conduct in obtaining the statement. Specifically, the court found that law enforcement officials knew, at the time Major Vick and Detective Klote interrogated Mr. Wood, that Mr. Wood was mentally ill and had been treated with psychiatric medication; that he had a history of mental illness and had been previously committed due to the condition; that Mr. Wood was deeply religious; and that he trusted Major Vick, a minister in his church and a personal friend, and looked to him as a "helper" due to his position in the church. Thus, the trial court suppressed the statement. This appeal by the State followed.

### Standard of Review

Review of a trial court's ruling on a motion to suppress is limited to determining whether the evidence is sufficient to support the ruling. *State v. Carter,* 955 S.W.2d 548, 560 (Mo. banc 1997), *cert. denied,* 523 U.S. 1052, 118 S.Ct. 1374, 140 L.Ed.2d 522 (1998); *State v. Trenter,* 85 S.W.3d 662, 668 (Mo.App. W.D.2002); *State v. Taber,* 73 S.W.3d 699, 703 (Mo. App. W.D.2002). The trial court's ruling will not be reversed unless it is clearly erroneous. *Trenter,* 85 S.W.3d at 668; *Taber,* 73 S.W.3d at 703. A ruling is clearly erroneous if the appellate court is left with a definite and firm impression that a mistake has been made. *Id.* In reviewing a trial court's ruling on a motion to suppress, the facts and any reasonable inferences arising therefrom are viewed in a light most favorable to the ruling. *Carter,* 955 S.W.2d at 560; *Trenter,* 85 S.W.3d at 668; *Taber,* 73 S.W.3d at 703. Deference is given to the trial court's factual findings and credibility determinations, but questions of law are reviewed *de novo. State v. Rousan,* 961 S.W.2d 831, 845 (Mo. banc 1998), *cert. denied,* 524 U.S. 961, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998); *Taber,* 73 S.W.3d at 703.

### Points on Appeal

■ In its two points on appeal, the State contends that the trial court erred in suppressing Mr. Wood's statement to police. It claims that the trial court's finding of coercive police conduct was not supported by substantial evidence and was against the weight of the evidence. It further argues that without coercive police conduct, the trial court misapplied the law in focusing on Mr. Wood's mental condition as a significant factor in determining the voluntariness of his statement.

■ When a defendant challenges the admissibility of a confession on the ground that it was involuntary, the burden falls upon the state to prove voluntariness by a preponderance of the evidence. *Rousan,* 961 S.W.2d at 845. "The test for voluntariness is whether, under the totality of the circumstances, the defendant was deprived of free choice to admit, to deny, or to refuse to answer and whether physical

or psychological coercion was of such a degree that the defendant's will was overborne at the time he confessed." *Id.* Factors to consider in reviewing the totality of the circumstances include whether the defendant was advised of his rights and understood them, the defendant's physical and mental state, the length of questioning, the presence of police coercion or intimidation, and the withholding of food, water, or other physical needs. *Id.*

A deficient mental condition alone does not render a confession involuntary. *Colorado v. Connelly,* 479 U.S. 157, 166–67, 107 S.Ct. 515, 520–21, 93 L.Ed.2d 473 (1986); *State v. Brown,* 998 S.W.2d 531, 547 (Mo. banc 1999), *cert. denied,* 528 U.S. 979, 120 S.Ct. 431, 145 L.Ed.2d 337 (1999); *Rousan,* 961 S.W.2d at 845; *State v. Bittick,* 806 S.W.2d 652, 658 (Mo. banc 1991). Instead, coercive police activity is a necessary predicate to a finding that a confession is not voluntary. *Connelly,* 479 U.S. at 167, 107 S.Ct. 515; *Rousan,* 961 S.W.2d at 845; *Bittick,* 806 S.W.2d at 658.

In this case, sufficient evidence was presented to support the trial court's ruling that Mr. Wood's confession was the product of coercive government conduct. The evidence viewed in the light most favorable to the trial court's ruling revealed that Mr. Wood had a history of mental illness, he exhibited signs of mental illness on the day of the shootings, the Sheriff's Department was aware of Mr. Wood's struggle with mental illness at the time of the interrogation, the Sheriff's Department knew that Mr. Wood was a deeply religious man, and the prosecutor and Sheriff's Department selected Mr. Wood's personal friend and minister in his church, Major Randy Vick, to elicit a statement from him.

Specifically, the record showed that Mr. Wood has struggled with and has been hospitalized several times for mental illness since 1985 and that the Sheriff's Department was aware of Mr. Wood's struggles. During one incident in 1990, the Sheriff's Department was summoned to Mr. Wood's home in Warrensburg. Major Vick responded to the call and found Mr. Wood mentally unstable. Mr. Wood was "very incoherent, ranting one moment, calm the next and singing the next." Major Vick placed Mr. Wood in protective custody. Later that day, a mental health evaluator found that Mr. Wood was not oriented to person, place, or day and that he was agitated, psychotic, delusional, and paranoid. As a result, Mr. Wood was involuntarily committed to a state mental hospital where he was diagnosed with chronic paranoid schizophrenia.

The Sheriff's Department again responded to the Wood's home in 1997 when Mrs. Wood reported her husband missing. Mr. Wood, who was described in the missing person report as mentally disabled, was found later that day by Highway Patrol officers walking around in a daze. Mr. Wood was again hospitalized as a result of the incident.

The evidence also revealed that Mr. Wood exhibited signs of mental illness on February 14 prior to and during his interrogation and that the Sheriff's Department was aware that Mr. Wood may have been suffering from mental illness that day. During the 911 call that morning, Mr. Wood's mother, Carol Wood, told the dispatcher that her son was mentally ill and that he had been on medications for his mental illness for the last few days. Later that afternoon at the hospital, Carol Wood told Major Vick that her son went to the mental health clinic and was prescribed medication three days earlier, on February 11, 2000.[1] Officers also interviewed and

---

1. On February 11, 2000, three days before the shootings, Mr. Wood sought help for depres-

took the statement of Mr. Wood's father, Gerald Wood, that afternoon at the hospital. Gerald Wood told officers that his son came to their house that morning just after 4:00 a.m. He was depressed and agitated. His son told him that he felt the devil was in him and that he wanted the elders to come and cast it out. He also told his father that he had thought about shooting his wife and himself. Eventually, after calming down, Mr. Wood returned to his home. Later that morning, shortly after 8:00 a.m., his son came back to their farm. He was very upset. He told his parents that he had shot his family and that he thought some of his family members might still be alive. He also asked his father to shoot him.

Additionally, a medical questionnaire completed during booking noted that Mr. Wood suffered from mental illness and psychiatric disorders, had a history of mental care, and was under the influence of prescription drugs. Records from the jail log indicated that prior to the interrogation, officers observed Mr. Wood in his cell crying, moaning, pacing, and laying on the floor in a fetal position. He was also observed on his knees with his face on the floor screaming, "Oh God," "What have I done?" and "Oh Ma." Later, officers checked on Mr. Wood, who was coughing heavily, and he charged towards them. The sheriff testified that he received updates throughout the day from the jailers regarding Mr. Wood's condition. Finally, Major Vick testified that Mr. Wood's demeanor on the day of the shootings was similar to his demeanor at the time of his 1990 psychiatric commitment.

In addition to the evidence of Mr. Wood's struggle with mental illness, the evidence revealed that Mr. Wood was a deeply religious man and that he had a personal and priestly relationship with his interrogator, Major Vick. Major Vick testified that he had known the Wood family for fourteen to fifteen years. He described his relationship with the Wood family as "good friends." He also testified that he and the Wood family had attended the same church, the Church of Jesus Christ, Warrensburg Restoration Branch, for the past eight to ten years. Major Vick also served as a priest in the church. His duties as a priest were "to preach, teach and expound and to minister to families in the branch." He also, along with elders in the church, administered to the sick and needy.

Major Vick explained that as a member of the same congregation and in talking with Mr. Wood's wife and parents, he became aware of Mr. Wood's struggle with mental illness. He was aware that priests and elders in the church had been occasionally called upon to administer to Mr. Wood due to his mental illness. Major Vick testified that as a priest, he, himself, had counseled Mr. Wood spiritually many times over the years and that he had preached during church services that were attended by the Wood family. Just six months before the shootings, Major Vick visited the Wood home along with an elder from the church to administer to Mrs. Wood. Mr. Wood was present during the visit. Major Vick further testified that he knew religion and the church were very important to Mr. Wood and that Mr. Wood was very dedicated to the church. He also stated that he knew his position as a priest

sion at Pathways. Tina Wood, who accompanied Mr. Wood to Pathways, reported that her husband had been suffering from symptoms of restlessness, decreased appetite and sleep, and withdrawal from the family. The evalu-

ators observed that Mr. Wood was very sad and slow in speech. They diagnosed Mr. Wood with major depression recurrent and prescribed anti-depression and anti-psychotic medications.

in the church was important to Mr. Wood and that Mr. Wood looked up to him as a priest in the church and saw him as a helper.

With knowledge of Mr. Wood's mental illness and of the importance religion played in his life, the sheriff and Major Vick met with the prosecutor and an assistant prosecutor prior to the interview to discuss whether Mr. Wood would talk to Major Vick. Major Vick testified that he believed he was chosen to interrogate Mr. Wood because of their relationship as friends, his position as priest in Mr. Wood's church, and the belief that Mr. Wood would talk to him. The sheriff testified that, at the time, he recognized the potential problems with Major Vick acting as Mr. Wood's interrogator. He also admitted that he knew Mr. Wood believed he was possessed by the devil and had asked for the assistance of ministers prior to the shootings. Although Major Vick's function at the Sheriff's Department was mainly administrative, the prosecutor ultimately decided that Major Vick would conduct the interview. A decision was also made to have a second officer, Detective Klote, present during the interview in order to "destroy" any claim of minister/penitent privilege.

During the course of the interview, Mr. Wood referred to the "turmoil" he had been experiencing in the days preceding the shootings, and he talked of the "snares" in his head and of "too many ensnaring thoughts." At one point during the interview, Mr. Wood said to Major Vick, "Randy, you showed up to help, just like you did before, to help me." Neither officer corrected Mr. Wood's misperception. Major Vick testified at the hearing that during the interrogation, he had concerns as to whether Mr. Wood understood that he was acting in his capacity as a law enforcement officer rather than as a minister and whether Mr. Wood was in touch with reality.

[C]ertain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment. *Miller v. Fenton,* 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985). Such is the case here. Knowing that Mr. Wood had a history of mental illness, that he was probably suffering from mental illness on February 14, and that he was deeply religious, law enforcement officials' decision that Major Vick, Mr. Wood's personal friend and spiritual advisor, would act as his interrogator constituted coercive police conduct. By strategically selecting Major Vick to interrogate Mr. Wood, when he would not otherwise have been the interrogator, for the explicit purpose of exploiting the pastoral relationship existing between Major Vick and Mr. Wood, particularly knowing of Mr. Woods questionable ability to discern reality, the trial court could reasonably conclude that the State transgressed the boundaries of the Fourteenth Amendment Due Process Clause and the Fifth Amendment right against self incrimination.

Sufficient evidence supported the trial court's ruling suppressing Mr. Woods' statement to law enforcement officials, and the ruling was not clearly erroneous. This court is not left with a definite and firm impression that the trial court made a mistake. The order of the trial court is affirmed.

HOLLIGER, P.J. and SMART, J., concur.