STATE of Missouri, Respondent,

v.

Gebar BYRD, Appellant.

No. ED 97826.

Missouri Court of Appeals, Eastern District, Division Four.

Dec. 18, 2012.

PATRICIA L. COHEN, Judge.

### Introduction

Gebar Byrd (Defendant) appeals the judgment of conviction entered by the Circuit Court of the City of St. Louis after a jury found him guilty of second-degree murder, first-degree involuntary manslaughter, first-degree endangering the welfare of a child, and second-degree domestic assault. Defendant claims the trial court erred in: (1) denying his motion for judgment of acquittal because the evidence was insufficient to support his conviction of second-degree murder; (2) denying his

motion to suppress statements; (3) denying his motion for judgment of acquittal because the evidence was insufficient to support his conviction of involuntary manslaughter; and (4) accepting inconsistent jury verdicts. We affirm.

### Factual and Procedural Background

Viewed in the light most favorable to the verdict, the evidence at trial revealed the following: Defendant and his girlfriend, Yasmin Rodriguez, had a son named Gebar Byrd Jr. On March 23, 2010, Defendant and Yasmin took Gebar Jr., then twenty-three months old, to a park adjacent to the Mississippi River. Defendant and Yasmin argued, and Yasmin informed Defendant that she was leaving him. Defendant was angry because he believed Yasmin was planning to take Gebar Jr. to Mexico. Defendant also felt that Yasmin had "trapped" him by using Gebar Jr. to prevent Defendant from going to Atlanta.

Yasmin walked toward the river with Gebar Jr. Defendant pushed Yasmin into the water while she was holding Gebar Jr. Yasmin did not know how to swim, and she had previously advised Defendant of that fact. Defendant jumped into the water to assist Gebar Jr. Defendant was unable to help Gebar Jr. or Yasmin, and he saw them sink into the water. Defendant left the park and later disposed of a child safety seat that was in his car and photographs of Gebar Jr.

On March 28, 2010, Yasmin's sister reported to the University City Police Department that Yasmin was missing. Detective Shannon Eaton and Detective Christopher Nappier of the University City Police Department questioned Defendant that day about the whereabouts of Yasmin and Gebar Jr. Defendant stated that he did not know where they were. On April 9, 2010, police recovered Yasmin's body from the Mississippi River after a fisherman discovered it.

On April 11, 2010, Defendant met a woman named Melissa Brown. Defendant informed Ms. Brown that his son's birthday was approaching. Ms. Brown inquired whether Defendant planned to find Gebar Jr. and spend his birthday with him. Defendant answered that "he did not need to look for his son because he already knew where they were . . . and he would not be able to get to them."

On April 21, 2010, Detectives Scott Sailor and Lon Ray of St. Louis Police Department questioned Defendant about Yasmin's disappearance. Defendant denied having any knowledge about the matter.

On May 26, 2010, officers from the University City Police Department arrested Defendant for an offense unrelated to Yasmin and Gebar Jr. While Defendant was in custody, Detective Eaton asked Defendant if he was willing to discuss Yasmin's disappearance, and Defendant responded that he was. During the interview, Defendant stated that he knew nothing about the disappearance of Yasmin and Gebar Jr.

Later that day, Detective Nappier interviewed Defendant. Defendant stated that he last saw Yasmin and Gebar Jr. at a riverfront park in the City of St. Louis. Defendant informed Detective Nappier that after he and Yasmin argued at the park, Yasmin entered the water while holding Gebar Jr. Defendant stated that he tried to save them but was unable to do so because the water was too cold. Defendant showed Detective Nappier, among others, where the incident occurred.

Detectives Nappier and Sailor transported Defendant to the University City Police Department. There, the detectives interviewed Defendant. Defendant repeated his earlier statement that Yasmin entered the water while holding Gebar Jr.

Detective Sailor escorted Defendant to the St. Louis Police Department, where Detectives Sailor and Ray interviewed Defendant. Defendant admitted that he pushed Yasmin into the Mississippi River while she was holding Gebar Jr. and that he knew Yasmin did not know how to swim. When the detectives asked Defendant what his intent was when he pushed Yasmin into the river, Defendant responded that he "wasn't taking [his] medication." Detective Sailor believed that Defendant "tr[ied] to dodge the question by saying . . . he wasn't taking his medication at the time."

The State charged Defendant with two counts of murder in the first degree and one count of endangering the welfare of a child in the first degree in connection with the events of March 23, 2010. The State also charged Defendant with one count of second-degree domestic assault with regard to an incident on April 30, 2009.

Prior to trial, Defendant filed a motion to suppress statements of Defendant that the State intended to admit in evidence. As grounds, Defendant alleged that the police did not advise him of his constitutional rights prior to interrogation and he did not waive his right to remain silent, to counsel, or to have counsel appointed for him. Defendant also asserted that the police did not cease interrogation after Defendant invoked his right to remain silent and to counsel.

The trial court held a hearing on the motion. Detective Eaton testified that prior to questioning Defendant on May 26, he advised Defendant of his *Miranda* rights. Defendant stated that he wished to waive his rights and signed a form entitled "University City Miranda Rules" confirming his waiver. Detective Nappier testified that before he interviewed Defendant later that day, he reminded Defendant of his *Miranda* rights. Defendant waived his rights. Detectives Nappier and Sailor testified that they subsequently interviewed Defendant. After approximately one hour, Defendant informed them that he no longer wanted to speak with them and that he "wanted a lawyer." The detectives ended the interview.

Detective Sailor testified that after he transported Defendant to the St. Louis Police Department later that day, Defendant advised Detective Sailor that he was "ready to tell [him] everything about what happened" to Yasmin and Gebar Jr. Detective Sailor reminded Defendant that he had requested an attorney. Defendant stated that he did not need an attorney, he was ready to tell the detective "everything that happened," and he was "tired and . . . wanted to get it over with." Detective Sailor asked Defendant if he was sure, and Defendant stated that he was sure. Detective Ray testified that he heard the foregoing conversation between Defendant and Detective Sailor.

The State introduced a video recording of the interview that followed Defendant's statement to Detective Sailor that he was "ready to tell [him] everything." At the beginning of the interview, Detective Sailor advised Defendant that he had the right to remain silent, to counsel, and to appointed counsel. Defendant stated that he understood his rights. Detective Sailor asked Defendant, "Having understood those rights, are you willing to talk to me about this incident?" Defendant responded, "Yes." Detective Sailor testified that Defendant had advised him in April that he was "on Haldol" and that he had been "institutionalized."

The trial court found that Defendant made a knowing, intelligent, and voluntary waiver of his constitutional rights. The trial court denied Defendant's motion to suppress his statements.

At trial, the State introduced the testimony of an officer who went to Defendant's home on March 28, 2010 to investigate the disappearance of Yasmin and Gebar Jr. and an officer who was present for the retrieval of Yasmin's body from the Mississippi River. In addition, Melissa Brown testified about her conversations with Defendant on April 11, 2010.

The State also called Detectives Eaton, Nappier, and Sailor to testify. The State played video recordings of the May 26, 2010 interviews of Defendant by Detectives Nappier and Sailor at the University City Police Department and by Detectives Sailor and Ray at the St. Louis Police Department. Defendant renewed his motion to suppress his statements and objected to the State's introduction of his statements through the recorded interviews and the testimony of Detectives Eaton, Nappier, and Sailor. The trial court denied the motion and overruled the objections.

At the close of the State's evidence, Defendant moved for acquittal on each count. The trial court denied the motion.

In connection with Yasmin's death, the trial court instructed the jury on first-degree murder and the lesser-included offenses of second-degree murder and voluntary manslaughter. The trial court instructed the jury on first-degree murder for the count relating to Gebar Jr.'s death and the lesser-included offenses of second-degree murder and first-degree involuntary manslaughter.

The jury found Defendant guilty of murder in the second degree as to the count relating to Yasmin, involuntary manslaughter in the first degree as to the count concerning Gebar Jr., endangering the welfare of a child in the first degree, and domestic assault in the second degree. The trial court sentenced Defendant to life imprisonment for second-degree murder consecutive to three consecutive seven-year terms on the remaining counts, for a total of life plus twenty-one years. Defendant appeals.

## Discussion

### A. Motion to Suppress

■ In his second point on appeal, Defendant argues that the trial court erred in denying his motion to suppress statements. More specifically, Defendant maintains that the police questioned him after he invoked his right to counsel without guaranteeing that his new waiver of rights was unequivocal and that the police knew that Defendant's mental capacity to waive his rights was "questionable" due to his use of anti-psychotic drugs. The State responds that Defendant initiated communication with the police after invoking his right to counsel and that no evidence supports his claim that he was mentally incompetent to waive his rights.

Appellate review of a trial court's decision on a motion to suppress evidence "is limited to a determination of whether substantial evidence exists to support the trial court's ruling," and we will reverse the ruling only if it is clearly erroneous. *State v. Carollo*, 172 S.W.3d 872, 873 (Mo.App. S.D.2005). We "consider[ ] the record made at the suppression hearing as well as the trial testimony" and review all facts and reasonable inferences therefrom in the light most favorable to the trial court's decision. *Id.* This court defers "to the trial court's superior opportunity to determine the credibility of witnesses." *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998).

■ "The Fifth Amendment's prohibition against self incrimination provides an accused the right to counsel during custodial interrogation." *State v. Nicklasson*, 967 S.W.2d 596, 606 (Mo. banc 1998) (citing

*Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). "Once an accused requests counsel, questioning must cease until counsel has been made available, unless the accused initiates further communication with police." *Id.* (citing *Edwards v. Arizona,* 451 U.S. 477, 485–86, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). "[T]he State ha[s] the burden to show [the defendant] initiated further discussions with the police and voluntarily, knowingly, and intelligently waived the right he had invoked." *State v. Cook,* 67 S.W.3d 718, 721 (Mo.App. S.D.2002).

Defendant spoke with several detectives on May 26 and, at one point, invoked his right to remain silent and to counsel. Prior to the first interview, Detective Eaton advised Defendant of his *Miranda* rights. Defendant stated that he wished to waive his rights and signed a written document confirming his waiver. When Detective Nappier interviewed Defendant later that day, he reminded Defendant of his *Miranda* rights. Defendant again waived his rights. Detectives Sailor and Nappier spoke with Defendant in a third interview on May 26. After approximately one hour, Defendant informed them that he no longer wanted to speak with them and that he "wanted a lawyer." The detectives ended the interview.

However, Defendant subsequently initiated further discussions with Detective Sailor. Detective Sailor testified that when he and Defendant arrived at the St. Louis Police Department, Defendant advised Detective Sailor that he was "ready to tell [him] everything about what happened" to Yasmin and Gebar Jr. Detective Sailor reminded Defendant that he had requested an attorney. Defendant stated that he did not need an attorney, he was ready to tell the detective "everything that happened," and he was "tired and . . . wanted to get it over with." Detective

Sailor asked Defendant if he was sure, and Defendant stated that he was sure. Detective Ray testified that he heard the foregoing conversation between Defendant and Detective Sailor.

The video recording of the interview that followed demonstrates that before asking Defendant any further questions, Detective Sailor reminded Defendant that he had the right to remain silent, to counsel, and to appointed counsel. Defendant stated that he understood his rights. Detective Sailor asked Defendant, "Having understood those rights, are you willing to talk to me about this incident?" Defendant responded, "Yes." At no time during the recorded interview did Defendant request counsel or ask to discontinue the questioning. The detectives' testimony and the video recording constitute substantial evidence supporting the trial court's denial of Defendant's motion to suppress his statements.

Defendant argues that the police failed to guarantee that the new waiver of his rights was unequivocal. In support of this argument, Defendant contends that the detectives did not require him to sign another document confirming his waiver. However, a defendant's oral statement that he would like to inform police what happened is sufficient to constitute a voluntary waiver of his previously-invoked rights. *See, e.g., Cook,* 67 S.W.3d at 722 (after invoking his right to counsel, the defendant advised police that he "would like to tell his side of the story").

Defendant also asserts that the police knew that his mental capacity was "questionable" due to his use of anti-psychotic drugs. Detective Sailor testified at the suppression hearing that Defendant had advised him that he was "on Haldol" and that he had been "institutionalized." However, Defendant's motion to suppress contains no mention of Haldol or any other medi-

cation. In addition, no evidence was produced at the suppression hearing or at trial regarding the effects of Haldol, whether Defendant was taking Haldol or any other medication at the time of questioning, or whether Defendant was mentally competent to waive his rights. Thus, no evidence in the record supports Defendant's claim. Point denied.

### B. Sufficiency of Evidence

When a criminal defendant challenges the sufficiency of the evidence, this court must determine "whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Primm,* 347 S.W.3d 66, 72 (Mo. banc 2011). We view the evidence "in the light most favorable to the verdict, considering all favorable inferences and disregarding all contrary inferences." *Id.* "This inquiry does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt." *State v. Bateman,* 318 S.W.3d 681, 687 (Mo. banc 2010) (quotation omitted). "Instead, the relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quotation omitted).

### 1. Second–Degree Murder

■ In his first point on appeal, Defendant claims that the trial court erred in denying his motion for judgment of acquittal at the close of the State's evidence because the evidence was insufficient to support his conviction of second-degree murder. Specifically, Defendant alleges that the State failed to present sufficient evidence that he was aware that his con-

duct was practically certain to cause Yasmin's death. The State counters that the evidence demonstrated that Defendant pushed Yasmin into the Mississippi River while angry at her and that he knew she was unable to swim.

"A person commits the crime of murder in the second degree if he ... [k]nowingly causes the death of another person...." Mo.Rev.Stat. § 565.021.1(1).[1] A person acts knowingly "[w]ith respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result." Mo.Rev.Stat. § 562.016.3(2).

■ "Direct proof of the required mental state is seldom available, and such intent is usually inferred from circumstantial evidence." *State v. Letica,* 356 S.W.3d 157, 166 (Mo. banc 2011). "The defendant's mental state may be determined from evidence of the defendant's conduct before the act, from the act itself, and from the defendant's subsequent conduct." *State v. McKinney,* 253 S.W.3d 110, 114 (Mo.App. W.D.2008) (quotation omitted). "It will be presumed that a person intends the natural and probable consequences of his acts." *State v. Stiegler,* 129 S.W.3d 1, 4 (Mo.App. S.D.2003) (quotation omitted). "A person is presumed to have intended that death follow acts which are likely to produce that result." *Id.* (quotation omitted).

Here, the State presented evidence that Defendant was aware that his conduct was practically certain to cause Yasmin's death. Defendant and Yasmin argued, and Yasmin informed Defendant that she was leaving him. Defendant was angry because he believed Yasmin was planning to take Gebar Jr. to Mexico. Defendant also felt that Yasmin had "trapped" him by using Gebar Jr. to prevent Defendant from going

---

1. All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.

to Atlanta. Defendant confessed that although he knew Yasmin was unable to swim, he pushed her into the Mississippi River. A jury may reasonably infer that Defendant knew that death was a natural consequence of pushing Yasmin into the Mississippi River when she could not swim.

Defendant argues that the only evidence of his intent was his statements to police and that those statements were insufficient to establish that he knowingly killed Yasmin. In support of his argument, Defendant relies on his comment, when police asked about his intent, that he "wasn't taking [his] medication." However, the fact that Defendant blamed a lack of medication instead of stating that he knowingly caused Yasmin's death does not render the evidence supporting his second-degree murder conviction insufficient. "An intent to kill in the context of second-degree murder may be inferred when, under the circumstances, the prohibited result expected may reasonably follow from a voluntary act, irrespective of any subjective desire on the part of the offender to have accomplished the prohibited result." *State v. Edwards*, 30 S.W.3d 226, 232 (Mo.App. E.D.2000).

Moreover, Detective Sailor testified that Defendant "tr[ied] to dodge the question by saying ... he wasn't taking his medication at the time." "[A] jury ... may believe or disbelieve all, part, or none of the testimony of any witness." *Stiegler*, 129 S.W.3d at 3 (quotation omitted). The jury was entitled to believe Detective Sailor's testimony that Defendant did not truthfully answer questions about his intent. Point denied.

### 2. Involuntary Manslaughter

In his third point on appeal, Defendant alleges that the trial court erred in denying his motion for judgment of acquittal at the close of the State's evidence because the evidence was insufficient to support his conviction of involuntary manslaughter. Specifically, Defendant argues that the State failed to establish the *corpus delicti* because the State did not prove that Gebar Jr. died and that Defendant directly caused his death. In response, the State contends that it presented Defendant's confession and other corroborating evidence establishing that Gebar Jr. was dead and that Defendant caused his death by pushing Yasmin into the Mississippi River while she was holding Gebar Jr.

"A person commits the crime of involuntary manslaughter in the first degree if he ... [r]ecklessly causes the death of another person...." Mo.Rev.Stat. § 565.024.1(1). "The State has the burden of establishing the *corpus delicti*." *State v. Hayes*, 347 S.W.3d 676, 681 (Mo.App. E.D.2011). "In a homicide case, the *corpus delicti* consists of two elements: (1) proof of the death of the victim, and (2) evidence that the criminal agency of another caused the victim's death." *Id.* "These elements may be proven by circumstantial evidence, but are not established until it has been proved that the death was not self-inflicted, due to natural causes, or an accident." *Id.* "The *corpus delicti* cannot be presumed and must be proved by legal evidence sufficient to show that the crime charged has been committed by someone." *Id.* (quoting *State v. Edwards*, 116 S.W.3d 511, 544 (Mo. banc 2003)).

Here, the State presented evidence establishing both that Gebar Jr. died and that Defendant caused his death. Defendant confessed that on March 23, 2010, he pushed Yasmin into the Mississippi River while she was holding Gebar Jr. Defendant admitted that he was aware that Yasmin did not know how to swim. Defendant jumped into the water to assist Gebar Jr.,

who was only twenty-three months old, but he was unable to help him. Defendant saw Gebar Jr. sink into the water. After Defendant left the location of the incident, he disposed of a child safety seat that was in his car and photographs of Gebar Jr. On April 9, 2010, the police retrieved Yasmin's body from the river. On April 11, 2010, Defendant informed Melissa Brown that "he did not need to look for his son" to celebrate Gebar Jr.'s birthday "because [Defendant] already knew where they were ... and he would not be able to get to them." Sufficient evidence may support a finding that the defendant killed the victim in the manner charged even where the State does not produce evidence of the victim's dead body. *See, e.g., State v. Davis*, 814 S.W.2d 593, 597–98 (Mo. banc 1991). Based on the evidence the State presented, a reasonable juror could have concluded that Gebar Jr. was dead and that Defendant caused his death. Point denied.

### C. Inconsistent Jury Verdicts

In his fourth point on appeal, Defendant claims the trial court erred in accepting the jury's guilty verdict on the count of endangering the welfare of a child in the first degree. More specifically, Defendant contends that the jury's determination that he was not guilty of knowingly causing Gebar Jr.'s death was inconsistent with its finding that Defendant acted knowingly with respect to the child endangerment count. The State counters that the jury's findings were not inconsistent and that even if they were, the trial court's acceptance of the verdicts was proper.

Defendant concedes that he failed to preserve his claim but requests that this court review his claim for plain error. In reviewing for plain error, we must first determine whether the claim of error "facially establishes substantial grounds for

believing that manifest injustice or miscarriage of justice has resulted." *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009) (quotation omitted). "If plain error is found, the court then must proceed to the second step and determine whether the claimed error resulted in manifest injustice or a miscarriage of justice." *Id.* at 607–08 (quotation omitted).

"The [trial] court has an obligation to examine the verdicts returned by the jury for defects, ambiguities, and inconsistencies." *State v. Flemons*, 144 S.W.3d 877, 883 (Mo.App. W.D.2004). "When a jury attempts to return verdicts that are inconsistent, the [trial] court should reject the jury's verdict and send it back to the jury for further deliberation to resolve the inconsistency." *Id.* "[W]hen a defendant is tried on a multiple count charge involving crimes with different elements, the jury's verdict does not have to be logically consistent." *Id.* at 882. "If the offense for which the defendant was acquitted requires proof of a unique element, distinct from the elements of the crime for which he was found guilty, the verdicts cannot be inconsistent." *Id.*

Here, the jury found Defendant not guilty of second-degree murder as to Gebar Jr.'s death but guilty of endangering the welfare of Gebar Jr., which are offenses requiring proof of different elements. "A person commits the crime of murder in the second degree if he ... [k]nowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person ..." Mo.Rev.Stat. § 565.021.1(1). "A person commits the crime of endangering the welfare of a child in the first degree if ... [t]he person knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old...." Mo.Rev.Stat.

§ 568.045.1(1). The second-degree murder offense involves causing another person's death, which is not required for the offense of endangering the welfare of a child. Thus, the jury's determination that Defendant did not knowingly cause Gebar Jr.'s death was not inconsistent with its finding that he knowingly acted in a manner that created a substantial risk to Gebar Jr.'s life, body, or health. *See, e.g., State v. Jordan,* 751 S.W.2d 68, 79 (Mo. App. E.D.1988) (jury verdicts of not guilty of robbery but guilty of first-degree murder were not inconsistent because the murder offense required proof that the defendant knowingly caused the victim's death after deliberation, whereas the robbery offense required proof that the defendant injured the victim while attempting to steal from him). Accordingly, we find no error in the trial court's acceptance of the jury's verdicts.

█ Moreover, the evidence of Defendant's guilt was overwhelming. The State introduced, among other evidence, Defendant's confession that he pushed Yasmin into the Mississippi River while she was holding Gebar Jr. Therefore, no manifest injustice or miscarriage of justice resulted that would entitle Defendant to relief under plain error review. *See State v. Forrest,* 183 S.W.3d 218, 224 (Mo. banc 2006). Point denied.

### Conclusion

The judgment of the trial court is affirmed.

LAWRENCE E. MOONEY, P.J., and KURT S. ODENWALD, J., concur.