

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED103514 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | |
| | ) | Honorable Tom W. DePriest, Jr. |
| CAMERON REED, | ) | |
| | ) | |
| Appellant. | ) | FILED: October 25, 2016 |

### Introduction

Appellant Cameron Reed ("Reed") appeals the judgment of the trial court entered after a jury trial. The jury convicted him of voluntary manslaughter and armed criminal action for shooting Victim to death. Reed confessed to shooting Victim during an interrogation, and video of that confession was shown to the jury. On appeal, Reed argues that the trial court erred in admitting the confession video because his statements were involuntary under the totality of the circumstances. Reed also asserts trial-court error in the denial of his motion to quash the jury panel because the selection of the panel violated his constitutional rights and Missouri law.

We are not left with a definite and firm impression that the totality of the circumstances surrounding Reed's confession deprived him of his free will and forced him to confess. Thus, the trial court did not clearly err in denying Reed's motion to suppress. Further, because Reed failed to present any evidence that his jury panel was the result of processes that violated either

his constitutional rights or Missouri law, the trial court did not err in denying his motion to quash the jury panel. Accordingly, the judgment of the trial court is affirmed.

## Factual and Procedural History

Reed appeals his conviction, following a jury trial, on one count of voluntary manslaughter and one count of armed criminal action. Reed does not challenge the sufficiency of the evidence supporting his conviction, so we will not detail the facts of the underlying crime.

At approximately 1:30 A.M. on June 30, 2013, Reed's neighbor found the dead body of Victim lying in the street near Reed's home and called police. During the investigation that morning, Reed, who was friends with Victim, agreed to make a statement at the police station. Reed was not a suspect at that time.

Reed was driven by police to the station at 6:00 A.M. When Reed entered an interview room, an unidentified supervising officer gave him a cigarette and some water. The officer instructed Reed to wait for the detectives to arrive and to knock loudly on the door if he needed more water or to use the restroom. At 6:58 A.M., Reed knocked on the door, requested water, and mentioned that his legs hurt so he needed to go home to get his pain medication. The officer brought more water and asked Reed to wait patiently because the detectives would be in shortly. The officer also lit a cigarette for Reed and turned up the heat because Reed was cold.

At 8:29 A.M., about 2.5 hours after Reed entered the interview room, Detective Rodesiler ("Det. Rodesiler") arrived and started the interview. Det. Rodesiler informed Reed of his Miranda[1] rights, although he was not a suspect at the time. Reed signed a Miranda waiver form. Reed told Det. Rodesiler that Victim had used heroin early that morning before the shooting and had been yelling at a woman who lived with Reed. To calm Victim, Reed walked him outside.

---

[1] Miranda v. Arizona, 384 US 436 (1966).

2

While outside, Reed stated that Victim had an aggressive encounter with a man in a black truck. Later in the interview, Reed identified the man in the black truck from a photo array. The interview ended at 9:39 A.M., but Reed stayed in the interview room when Det. Rodesiler left. Officers allowed Reed to use the restroom at 11:02 A.M. About 5.5 hours after arriving at the station, at 11:37 A.M., Reed left.

Police investigated the man in the black truck, but soon eliminated him as a suspect. Now without a suspect, Det. Rodesiler called Reed the following day, July 1, and asked for another interview. Reed agreed, rode with police to the station, and entered the interview room at 11:36 A.M. The supervising officer provided Reed with coffee and cigarettes while he waited, and allowed him to text his mother. The interview-room video showed that Reed spent much of his wait sleeping in various positions. Around 1:00 P.M., Reed was allowed to use the restroom and was given pretzels to eat. Throughout the wait, Reed and the officer developed a cordial relationship, with the officer accommodating Reed's requests and Reed thanking the officer for doing so.

At 1:40 P.M., about two hours into Reed's wait, he knocked on the door and complained about his purported disc bulge and the rheumatoid arthritis in his legs, which Reed had told the officer about earlier that day. The officer responded, "Anything else I can do to make you more comfortable? I mean, we got the cushion seat there, can I what else—what else can make you more comfortable?" Reed replied, "Nothing for real, I need like my muscle relaxers and stuff. Like, I take real strong medicine." Reed immediately stated that some days he did not take the medication because he did not like being "doped up" in front of his kids. Reed continued, "So I really don't want to take the stuff today, I'm supposed to have the kids in a little bit." The

3

officer apologized, asked if Reed wanted to lay down, and offered Reed more coffee and cigarettes. Reed kept waiting.

During a thirteen-minute stretch around 2:00 P.M., Reed knocked on the door six different times. When an officer answered the door on the sixth set of knocks, Reed stated that he had to use the bathroom badly. An officer immediately took Reed to the restroom and, upon return to the interview room, gave Reed more cigarettes.

The detectives arrived at 3:10 P.M.—roughly 3.5 hours after Reed had entered the interview room—to conduct the interview. Det. Rodesiler, who apologized for the wait, was joined by Detective Wilson ("Det. Wilson"). Reed listened to and waived his Miranda rights at the beginning of the interview. After Reed told the detectives his original story, the detectives informed Reed that the evidence pointed to him as the shooter, but they did not know his motive. Reed initially denied that he had shot Victim because Victim was his friend. When the detectives started pressing Reed about the shooting, Reed asked for a cigarette several times. The detectives denied him a cigarette; Det. Wilson explained, "I don't like smoke in here, I'm sorry, you can have one when we're done."

Later in the questioning, Reed stated, "I'm hurting, I'm in pain, I don't have my pain medicine, I have business to attend to today for my kids to do a drug drop, and to go meet with the CPS later so she can see my kids and do a home visit." Det. Wilson replied, "I'm telling you that is not going to happen today, okay?" Without reference to the medicine, Reed reiterated his position that he did not shoot Victim, and the interrogation continued.

Finally, the detectives told Reed that they were booking him for murder, regardless of what his story was, because of the strength of the rest of the evidence. Fearing he would "go to jail forever," Reed agreed to tell his story. Reed commented that he was "not going to go to jail

4

for no [expletive] First Degree Murder, man." After the detectives gave Reed a cigarette, he confessed to shooting Victim, but he claimed that he was acting in self-defense and to protect others in his household. Reed was subsequently charged with second-degree murder and armed criminal action.

Before trial, Reed filed a motion to suppress his confession because his statements were not voluntary. Det. Rodesiler testified for the State in the subsequent hearing. The detective believed that Reed had understood and voluntarily waived his Miranda rights. The detective testified that he never threatened or made promises to Reed to secure his confession, and that Reed did not appear to be afraid of the detectives. Regarding the refusal to give Reed a cigarette, Det. Rodesiler interpreted Reed's requests to be a "delay tactic." Det. Rodesiler also testified that officers were not allowed to give Reed his medicine because only a nurse could do so. The trial court overruled Reed's motion to suppress.

Reed also moved to quash the jury panel because the racial makeup of his panel consisted of zero African-American males. Reed's counsel asserted that 23.7% of St. Louis County's population was African-American, according to the census bureau. The trial court found that the jury panel contained 54 prospective jurors, ten of which were African-American—all ten were female—which the trial court found was a ratio of "about 18 percent"[2] African-Americans on the jury panel. The trial court also stated that it was the court's belief that prospective jurors were randomly selected by computer from licensed drivers and registered voters in the county. Thus, the trial court denied Reed's motion to quash the jury panel.

At trial, the State played Reed's confession for the jury. Reed testified and claimed that he had shot Victim in self-defense. The jury convicted Reed of voluntary manslaughter—the

---

[2] Ten out of 54 prospective jurors is 18.5%.

5

lesser-included offense to the second-degree-murder charge that he faced—and armed criminal action. After denying a motion for new trial, the trial court sentenced Reed to fifteen years in prison for voluntary manslaughter and three years for armed criminal action, to be served consecutively. This appeal follows.

## Points on Appeal

Reed presents two points on appeal. First, Reed argues that the trial court clearly erred in denying his motion to suppress and allowing his confession into evidence. Reed contends that the totality of the circumstances rendered his confession involuntary. Second, Reed asserts trial-court error for refusing to quash the jury panel because the makeup of the panel violated his constitutional rights and Missouri law.

## Discussion

### I.     Point One—Voluntary Confession

#### A.     Standard of Review

We review a trial court's decision on a motion to suppress evidence to determine whether substantial evidence exists to support the trial court's ruling. State v. Byrd, 389 S.W.3d 702, 707 (Mo. App. E.D. 2012). We reverse only if the trial court's ruling is clearly erroneous. Id. To find clear error, an appellate court must be "left with a definite and firm belief a mistake has been made." State v. Haldiman, 106 S.W.3d 529, 533 (Mo. App. W.D. 2003). This Court considers "all facts and reasonable inferences therefrom in the light most favorable to the trial court's decision." Byrd, 389 S.W.3d at 707. We defer "to the trial court's superior opportunity to determine the credibility of witnesses." Id. (quoting State v. Rousan, 961 S.W.2d 831, 845 (Mo. banc 1998)).

6

B.    Analysis

The Due Process Clause bars involuntary confessions from being admitted into evidence at trial. State v. Faruqi, 344 S.W.3d 193, 203 (Mo. banc 2011). When a defendant challenges a confession as involuntary, the State bears the burden to prove the voluntariness of the statement by a preponderance of the evidence. Rousan, 961 S.W.2d at 845.

To determine whether a confession was involuntary, we look at the totality of the circumstances. Faruqi, 344 S.W.3d at 203. A confession is involuntary when the totality of the circumstances "created a physical or psychological coercion sufficient to deprive the defendant of a free choice to admit, deny, or refuse to answer the examiner's questions." Id. (internal quotations omitted). In our analysis, we consider the characteristics of the defendant, such as the defendant's age, experience, intelligence, gender, lack of education, infirmity, and unusual susceptibility to coercion. State v. Bates, 464 S.W.3d 257, 263 (Mo. App. E.D. 2015) (citing Faruqi, 344 S.W.3d at 203). We also examine the circumstances surrounding the confession, including whether the defendant was advised of his rights and understood them, the length of the detention, the repeated and prolonged nature of the questioning, the presence of police coercion and intimidation, and the use of coercive techniques (such as deprivation of food, water, or other physical needs). Id. In our analysis, no single fact is dispositive. Id.

Here, there is no indication that Reed was particularly susceptible to police coercion. Reed is an adult male, who repeatedly told police that he was attending college and that he was on the honor roll. Nothing in our record suggests that Reed suffered from any mental disabilities. Further, Det. Rodesiler testified that Reed did not appear to be afraid of or intimidated by the detectives. Thus, the factors relating to Reed's susceptibility to coercion all weigh towards a finding that his confession was voluntary.

7

The actual circumstances surrounding the police questioning also indicate that Reed's confession was voluntary. Reed was advised of his Miranda rights before both interview sessions, and he waived those rights both times. Det. Rodesiler testified that he thought Reed understood his rights. Our review of the video supports the detective's testimony, as Reed listened to the warnings, appeared to understand them, and calmly signed the Miranda waiver form before both interviews. The record contains no evidence indicating that police threatened or intimidated Reed to sign the waiver form or to answer their questions.

Reed asserts that the detectives' tactics were coercive because he was interrogated for seven hours while in pain and that he was "essentially told during the second interview that he could not have his medication or a cigarette until he confessed." The record clearly shows that Reed exaggerates the facts relating to his interrogation. When viewed in the light most favorable to the trial court's ruling, the record strongly demonstrates that Reed was not coerced into a confession.

First, Reed was not interrogated for seven hours. At the motion-to-suppress hearing, Det. Rodesiler estimated that Reed was in the interrogation room for seven hours on the second day. But the detectives were interviewing other witnesses for much of that time. The video and corresponding transcript of Reed in the interview room indicates that Reed arrived in the interview room at 11:36 A.M. While waiting, Reed was given cigarettes, coffee, snacks, and bathroom breaks. Reed slept during much of this time. The detectives arrived about 3.5 hours later, at 3:10 P.M., and they apologized for the wait. The detectives explained that they had "a hundred things going at once." The video indicates that Reed left the interview room after his confession at 5:10 P.M. While Reed might have been at the station for seven hours, our record indicates that he was in the interview room for less than six hours and interrogated only two

8

hours. Reed's wait might have been boring, but the length was, in and of itself, insufficient to overcome his free will. See State v. Harris, 477 S.W.3d 131, 142 (Mo. App. E.D. 2015) ("Two hours is not an unduly long period of time and does not, in and of itself, support a finding that the length of questioning was coercive"); Rousan, 961 S.W.2d at 846 (length of interrogation was not coercive when defendant was in custody for six hours and questioned for, at most, 3.5 hours).

Next, Reed's argument that the detectives essentially told him "during the second interview that he could not have his medication or a cigarette until he confessed" is troubling on its face. However, when reviewing the context of the situation in its entirety, Reed's argument fails. Reed did not bring his medicine to the police station. Det. Rodesiler testified that the police were not allowed to give Reed any pain medication without a nurse present. About two hours after Reed arrived at the police station on the second day, he commented, "if I stay in here too long like this I'll be either bedridden and hospitalized [*sic*]." The following conversation occurred with the supervising officer:

| [OFFICER]: | Anything else I can do to make you more comfortable? I mean, we got the cushion seat there, can I what else—what else can make you more comfortable? |
|---|---|
| MR. REED: | Nothing for real, I need like my muscle relaxers and stuff. Like, I take real strong medicine. |
| [OFFICER]: | Okay. |
| MR. REED: | And some days I don't take it especially when I'm going to go get my kids, because I can't watch them I'll be all doped up and stuff. |
| [OFFICER]: | Sure, sure. |
| MR. REED: | So I really don't want to take the stuff today, I'm supposed to have the kids in a little bit. |

Clarified with the context of the situation, Reed admitted that he did not take his medicine every day and that he did *not* want to take the medicine that day because he did not want to be "all doped up and stuff." Thus, the record clearly shows that the detectives were not allowed to give Reed medication, that Reed did not want to take the medicine that day, and that—viewing a reasonable inference most favorable to the trial court's ruling—the medicine was *optional*.

9

Regarding the cigarettes, Reed asked at least four times for a cigarette during the questioning on the second day. Detective Wilson explained that he did not like smoke in the interview room and that Reed could have a cigarette when the interview ended. Det. Rodesiler also testified during the suppression hearing that he believed Reed was asking for a cigarette as a "delay tactic." While the detectives did withhold a cigarette, the record does not support Reed's claim that the cigarette was used as a coercive tactic to obtain a confession. Instead, the detectives withheld the cigarette when they thought Reed was trying to delay the interrogation. We also note that Reed could have stopped the interrogation at any time by asking for a lawyer or asserting his silence, rights of which Reed had been informed by the detectives prior to any questioning. The record lacks any suggestion that Reed sought to stop the interrogation and that the detectives refused to stop.

Reed cites State v. Wood, 128 S.W.3d 913 (Mo. App. W.D. 2004), as support for this point on appeal. In that case, Wood was arrested and interrogated as the suspect of a shooting. Id. at 914. Wood had a history of mental illness and had been hospitalized several times in the past. Id. at 916. The evidence revealed that the sheriff's department knew about Wood's mental illness and that, in fact, Wood had exhibited signs of mental illness that day. Id. Knowing that Wood was a religious man, the sheriff's department assigned Wood's *priest*, who also worked in law enforcement, to conduct the interrogation. Id. Wood confessed. Id.

The Western District found this interrogation technique to be so offensive to a civilized system of justice that it was impermissible. Id. at 918. "Knowing that Mr. Wood had a history of mental illness, that he was probably suffering from mental illness on [the day of the interrogation], and that he was deeply religious, law enforcement officials' decision that [the interrogator], Mr. Wood's personal friend and spiritual advisor, would act as his interrogator

10

constituted coercive police conduct." Id. Thus, the trial court did not clearly err in finding Wood's confession to be involuntarily given, and the trial court's judgment was affirmed. Id.

Wood provides Reed with no support given the substantially different facts of that case. Here, there is no evidence in the record that Reed suffered from any mental impairment or was interrogated by a confidant. As detailed above, the totality of the circumstances surrounding Reed's interrogation was significantly less coercive than in Wood and was not so offensive to a civilized system of justice as to render Reed's confession involuntary. Further, Wood *affirmed* the trial court's decision to *grant* the motion to suppress by finding no clear error. Here, Reed bears the greater burden of seeking a reversal by proving clear error. Wood is inapposite, as it is both factually and procedurally distinguishable.

Because we are not left with a definite and firm belief that the totality of the circumstances deprived Reed of his free will and forced him to confess, we find no clear error. Haldiman, 106 S.W.3d at 533. Accordingly, Point One is denied.

## II. Point Two—Reed's Jury Panel

Reed argues that the trial court erred by denying his motion to quash the jury panel because it did not reflect a fair cross-section of the community. Reed's argument is based solely on the racial composition of his jury panel. Reed argues that the county population was 23.7%[3]

---

[3] At trial, defense counsel alleged that the 23.7% figure was derived from census-bureau reports. The trial court accepted that percentage without having any underlying evidence to support defense counsel's assertion. We are unable to review on appeal whether that percentage is supported by evidence, as the only "evidence" of the racial composition of St. Louis County was defense counsel's unsworn assertion in the transcript. Such a statement is not evidence. Even assuming as correct that St. Louis County's population is comprised of 23.7% African-Americans, the differential between that percentage and the percentage of African-American jurors on Reed's venire (18.5%) is less than 6%. We note that our courts have held that a 10% differential is required to prove a prima facie case of under-representation in a fair cross-section claim. Ringo v. State, 120 S.W.3d 743, 747 (Mo. banc 2003); State v. Hofmann, 895 S.W.2d 108, 111 (Mo. App. W.D. 1995).

11

African-American, but his jury panel was only 18.5% African-American (with zero African-American males).

Defendants have a constitutional right to have a jury panel drawn from a fair cross-section of the community. State v. Anderson, 79 S.W.3d 420, 430 (Mo. banc 2002). The right to a jury panel selected at random from a fair cross-section of the county is also protected by Section 494.400 (Cum. Supp. 2012).[4] We apply the same framework when analyzing a fair cross-section claim, whether the alleged violation is constitutional or under Section 494.400. See Robertson, 262 S.W.3d 285, 289 (Mo. App. W.D. 2008). "To establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group within the community, (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) that this under-representation is due to systematic exclusion of the group in the jury selection process." Anderson, 79 S.W.3d at 430; see also Duren v. Missouri, 439 U.S. 357, 364 (1979).

To demonstrate systematic exclusion in the third prong, the defendant must prove unfair under-representation in his or her specific jury panel *and* "in general on other [panels] in the relevant judicial system near the time of his trial." Anderson, 79 S.W.3d at 430. "A single panel that fails to mirror the make-up of the community is insufficient to establish a prima facie case of systematic exclusion." State v. Anderson, 306 S.W.3d 529, 542 (Mo. banc 2010) (internal citation omitted).

Reed relies entirely on the "skewed result" of *his* jury panel. This argument is wholly inadequate. Reed failed to prove prong three of his prima facie case because he presented no

---

[4] All statutory references are to RSMo (2000), unless otherwise indicated.

evidence of systematic under-representation of any identifiable group "in general on other [panels] in the relevant judicial system near the time of his trial." Anderson, 79 S.W.3d at 430. Reed's reliance entirely on the makeup of *his* jury panel is insufficient to establish systematic exclusion and, thus, to establish a prima facie case of a fair cross-section violation. Anderson, 306 S.W.3d at 542; Robertson, 262 S.W.3d at 289.

Reed also cites Section 494.410 (Cum. Supp. 2012)—which outlines the procedure that the board of jury commissioners must follow in compiling the master jury list—in an apparent attempt to argue that this section was violated. A challenging party must prove a "substantial failure" to comply with the jury-selection statutes to prevail in a motion to quash the jury panel. Section 494.465.2. The record is void of any evidence suggesting any failure to comply with the requirements of Section 494.410. No hearing was conducted to elicit evidence of the board's procedures in compiling a master jury list, so it is impossible for us to review whether the board substantially complied with Section 494.410. In denying Reed's motion to quash the jury panel, the trial court noted that a computer randomly selected jurors from a list of the county's licensed drivers and registered voters.[5] If true, this method of selecting jurors is specifically permitted by Section 494.410.2. In any event, without evidence explaining the board's actions or the procedure followed in compiling the master jury list, Reed did not prove a substantial failure to comply with Section 494.410.

Because Reed failed to establish a violation of his constitutional rights or of Missouri law, the trial court did not err in overruling Reed's motion to quash the jury panel. Point Two is denied.

---

[5] It appears that the trial court made this finding based on personal knowledge, as we see no testimony or other evidence in our record supporting this finding.

13

## Conclusion

The judgment of the trial court is affirmed.

_____
KURT S. ODENWALD, Judge

James M. Dowd, J., concurs.
Gary M. Gaertner, Jr., J., concurs.

14