

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED102752 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of Cape Girardeau County |
| vs. | ) | |
| | ) | Honorable Benjamin F. Lewis |
| KENNETH BELL, | ) | |
| | ) | |
| Appellant. | ) | FILED: May 3, 2016 |

## Introduction

Appellant Kenneth Bell ("Bell") appeals from the judgment of the trial court entered after a jury convicted him on two counts of first-degree murder and one count of armed criminal action. On appeal, Bell argues that the trial court clearly erred in denying a pretrial motion to suppress Bell's confession. Bell contends that the detectives violated Edwards v. Arizona[1] by interrogating him after he told the detectives he was invoking his right to have legal counsel present before speaking to them. Bell also argues that the trial court erred in allowing the State to introduce evidence that he possessed cocaine when Bell was arrested.

The evidence of Bell's possession of cocaine was inadmissible because it constituted uncharged bad acts. The evidence was not logically or legally relevant for any other purpose. However, because there is no reasonable probability that the jury would have reached a different

---

[1] 451 U.S. 477 (1981).

conclusion but for the improper evidence, Bell suffered no outcome-determinative prejudice. Therefore, we cannot reverse the trial court's judgment on this point.

However, because the detectives engaged in the functional equivalent of express questioning under Rhode Island v. Innis[2] before Bell initiated any conversation with the detectives, the detectives improperly subjected Bell to interrogation after he invoked his right to counsel. Accordingly, the trial court should have suppressed Bell's confession. Because we cannot conclude that the admission of Bell's confession was harmless beyond a reasonable doubt as to his conviction for murder in the first degree, the trial court's judgment is reversed and remanded. However, because the admission of Bell's confession was harmless error as to the charges of murder in the second degree, this matter is remanded, and in accordance with Rule 30.22,[3] the trial court is directed to allow the State to elect within sixty days from the issuance of the mandate, to either retry Bell on all issues within the charges of murder in the first degree and armed criminal action, or to accept the lesser convictions of murder in the second degree and armed criminal action.

Factual and Procedural History

## I.  Underlying Factual History

Viewed in the light most favorable to the verdict, the following evidence was established at trial:

Bell was charged with two counts of first-degree murder and one count of armed criminal action for the death of Shannon James ("James") and James's girlfriend, Misty Cole ("Cole"). Bell, James, and Cole lived in the same apartment building. On February 7, 2013, around 11:30 p.m., Bell and his brother were smoking cigarettes on a sidewalk behind Bell's apartment

---

[2] 446 U.S. 291 (1980).
[3] All rule references are to Mo. R. Crim. P. (2015).

building. James and his friend Argentry Marshall ("Marshall") walked on the sidewalk towards Bell. As James and Marshall approached, Bell and his brother remained standing in the middle of the sidewalk. Marshall decided to walk around, but James stayed on the sidewalk and bumped into Bell. After a brief verbal altercation, Bell went into his apartment, which had an exterior door in the back of the apartment building. Bell's girlfriend, who was sitting at the kitchen table, asked Bell what was going on. Without replying to his girlfriend, Bell retrieved a gun from his kitchen and walked through his apartment's front door and into a shared foyer area in the apartment building.

Meanwhile, James and Marshall had been walking toward the front door of the apartment building, which opened into the shared foyer area. As James opened the front door, Marshall saw Bell through a window. Bell was standing in the foyer area brandishing a gun. Marshall decided against going inside because of Bell's gun, but James decided to go inside. Marshall watched James walk through the small foyer and to the front door of his apartment. Cole opened the door for James from inside of their apartment. Marshall testified that he saw the door to James's apartment open, but that he immediately turned and walked away. As Marshall started to walk away, he testified that he heard three to four gunshots, then a slight pause, and then a couple more. Marshall called 911 as he ran away. After officers had arrived on the scene, an officer saw the silhouette of a person in a nearby alleyway. After a short pursuit, police apprehended the silhouetted person, who was identified as Bell. Police conducted a pat-down search of Bell at the police station and found cocaine in his rear pants pocket. Bell also tested positive for gunshot residue.

As police assessed the scene, officers found Cole's dead body in the doorway of her shared apartment with James. Officers found James's dead body inside the apartment. Both

3

Cole and James suffered fatal gunshot wounds. Officers found six spent bullet casings and 11 spent bullets nearby, all of which were the same brand (R & P Luger 9mm). Police also searched Bell's apartment and found an assortment of live and spent bullets and shell casings, and an empty gun holster. A semi-automatic gun was found on the roof of a house next-door to the apartment complex. The gun fit inside the empty holster found in Bell's apartment, and DNA taken from the gun matched Bell's DNA. All of the bullets inside the gun were the same R & P Luger 9mm rounds found near the victims. A criminalist testified at trial that all eighteen spent bullet *casings* were fired from the gun. The criminalist was unable to say with scientific certainty, but the physical evidence was consistent with the gun having fired the spent *bullets*. An autopsy confirmed that the victims died of gunshot wounds. James was shot several times and died of a gunshot wound to the head; Cole was shot six or seven times, with several of the wounds possibly fatal.

## II. Bell's Time in Custody and his Confession

Several parts of Bell's time in custody are relevant to this case. Detectives Don Perry ("Det. Perry") and Darren Estes ("Det. Estes") conducted two separate conversations with Bell. The first conversation occurred at 2:52 a.m. on February 8, 2013—just hours after the shootings. The second conversation occurred that afternoon, at 3:47 p.m. on February 8, 2013.

### A. First Conversation

At 2:52 a.m. on February 8, 2013, Det. Perry and Det. Estes took Bell to an interview room. The detectives informed Bell that he was under investigation for the murders and read Bell his Miranda[4] rights. This exchange occurred:

PERRY:    Do you understand each of the rights I have just explained to you?
BELL:    Yes.

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

4

PERRY:        Thank you. Okay, having these rights in mind, do you wish to talk to myself and Corporal Estes at this time?

BELL:        I would rather have a lawyer present.

PERRY:        Okay. Okay, just so you speak kinda quietly, would you repeat that for me? So I don't misinterpret anything that you say.

BELL:        I would rather have a lawyer present.

PERRY:        Okay. Are you telling me that—if I understood what you said, you said, "I would rather have one." Is that correct?

BELL:        Yes.

On a written advice-of-rights form, Bell wrote "NO" on the line that reads, "Having these rights in mind, do you wish to talk to me now?" The detectives nevertheless continued their attempt to get Bell to waive his Miranda rights. As the trial court found in its order denying Bell's motion to suppress, "The detectives did not ask Bell anything specific to the investigation but they continued to talk to him in a manner clearly designed to draw Bell into waiving his Miranda rights and answering questions about the murders."[5] According to the video's timestamp, the first interview lasted thirty-five minutes.

B.     Intervening Hours

Two relevant events occurred between Bell's first and second conversations with the detectives. The first intervening event occurred between 11:00 a.m. and noon on February 8. Security video of Bell's holding cell showed Station Commander Barry Meadows ("Commander Meadows") approach Bell, who was in his cell. Commander Meadows told Bell that his wife[6] had tried to call a couple of times, but that Bell was not allowed to take phone calls.

The second intervening event occurred at approximately 2:00 p.m. Surveillance video of Bell's cell showed Corporal[7] Bonham ("Cpl. Bonham") approach Bell's cell. Cpl. Bonham told

---

[5] For example, at various points in the interrogation, Det. Perry told Bell, "you know I can talk all day if I want um without asking you any questions, and I don't intend to ask any questions," and, "You know, people have a change of heart and like I said, I don't want you to think that there's any bad blood here. I don't want you to think I'm mad at you for not wanting to talk. Like I said, that's your right, so. I'm not gonna force you to, but like he said, nothing prevents us from talking to you either. And you're gonna know us because we're gonna talk to you a little bit."

[6] Bell and his wife were separated, and Bell also had a girlfriend as stated above.

[7] Bonham was subsequently promoted to Sergeant and was frequently referred as a "Sergeant" in our record.

5

Bell that Bell needed to soften the jurors and warned about how the jurors would perceive the situation if Bell did not explain his side of the story. Cpl. Bonham implored Bell to put himself in the minds of the jurors and to consider that Bell had a ruthless killing on his hands. Cpl. Bonham also told Bell that the jury would have no mercy if it did not know what happened. Cpl. Bonham proceeded to escort Bell to the restroom.

### C.    Second Conversation and Bell's Confession

At approximately 3:47 p.m. that afternoon, February 8, Det. Estes and Det. Perry removed Bell from his cell and brought him to an interview room. After the detectives reintroduced themselves, the following exchange occurred 58 seconds into the conversation:

> PERRY:    I don't think it'll keep me from sleeping today though. Kenneth, correct? What you'd still like to go by. **Just talked to your girlfriend.** Uh, what I'm gonna do, I've got a few things I wanna read to you, okay? I, sometimes people have the tendency to think that we're bluffing or we're playing games and …
>
> BELL:    [Interjecting] **You talk to my wife, or my girlfriend?**
>
> PERRY:    Uh we actually talked to both, but I just uh Darren and I just talked to your girlfriend. She really didn't know that your wife was pregnant, but anyway um I don't want you to think that we're bluffing ya or anything of that nature, okay. Uh just want to make sure that everything that I told you this morning that you believe that—I want you to at least know that every opportunity I've tried to give you was the truth; the facts as far as that.

(Emphasis added.)

Without any response from Bell, Det. Perry immediately read the full text of the arrest warrant aloud. The trial court found that, based on Det. Perry's testimony, department policy and Section 544.180[8] required police to read this arrest warrant to Bell. Det. Perry testified that anyone could have read the warrant to Bell, but that, "if [Bell] did want to talk, I did want to be present." The warrant stated, *inter alia*, that a judge found probable cause for Bell's arrest. The

---

[8] All statutory references are to RSMo (2000).

warrant also stated that bond was set at $2.5 million. Det. Perry asked if Bell had any questions about the warrant, and Bell said, "No." Det. Perry replied:

PERRY: Okay. Man, you're a calm dude to sit there after hearing that. Okay. You will get a copy of [the warrant] at a later point in time, okay?
BELL: Uh huh.
PERRY: I don't want you to think, you know I, I tried to express to you earlier about having the opportunity to put your side out when we've been working with the Major Case Squad all day.
BELL: Uh huh.
PERRY: All night uh, you will get a copy of this. It's actually public record. Uh, I would imagine by tomorrow it'll be in the newspaper if not by tonight and on KFVS-12. I don't know if you're familiar with either one of those two; the local newspaper and all that.

Without any reply from Bell, Det. Perry then read every word of the probable-cause statement that accompanied the warrant. Det. Perry testified that nothing required him to read the probable-cause statement to Bell, but said that he often chose to do so in big cases. The probable-cause statement outlined the State's case, including a description of the crime scene, the identity of the victims, the physical evidence found at the scene, and the pursuit and arrest of Bell. After Perry finished reading the probable-cause statement, this exchange occurred:

PERRY: What this basically is, is the mildest, least amount of information that we can provide to the courts because it is public record, okay?
BELL: Yeah.
PERRY: So everybody in the City of Cape will have that by tonight because I've already given that to our public relations officers because I don't have any choice. They're a matter of public record, they did not used to be when I was a police officer but they are now, okay? So we put the bare minimum of information so we don't put our whole entire case out there, okay? So, I wanted to make sure that you understood that there's a lot of information and evidence that points to you and probable cause to get a warrant and get a ... that's the largest—I've been doing this for over twenty-five years and that's the largest bond amount I've ever seen on a case that I've been involved in. (To Det. Estes) Have you seen anything bigger? For yourself?
(Det Estes shakes his head no)
PERRY: (To Bell) Uh, the reason we've asked you ... and I'm not going to ask you if you want to, I will tell you if you would like to give any

7

|  |  |
|---|---|
| | information, and if you ask me, "Don ... Darren ..." whoever, "Sir ..." you would like to talk to me, you would like to give your version or account of what transpired over there; all you have to do is ask me. I will re-advise you of your <u>Miranda</u> Rights because that's my procedures, okay? |
| BELL: | Uh huh. |
| PERRY: | I'm not going to ask you any questions, but I'm gonna tell you this is a mild piece of the information that we do have, okay? And ... |
| BELL: | Can I get some water? |
| PERRY: | Huh? |
| BELL: | Can I get some water? |
| PERRY: | Yeah. |

(Det. Estes exits the interview room)

The timestamp on the video showed that eleven minutes and 30 seconds had passed since

the start of the interview. With Det. Estes out of the room, Bell stated:

|  |  |
|---|---|
| **BELL:** | **You said you talked to my wife and my girlfriend?** |
| PERRY: | Uh, I didn't talk to her but other officers did. |
| BELL: | Okay. |
| PERRY: | Uh, they talked to your wife early on this morning because I know she showed up at the location that the ... at 401 South Pacific and that was early, early, early. |
| BELL: | Okay. |
| PERRY: | Or late, late—however you want to look at it uh when I first ... I went there before I came here this morning. |
| BELL: | Okay. |
| PERRY: | And you were already in custody, so. |
| BELL: | And my girlfriend? |
| PERRY: | Uh she just left here. |
| **BELL:** | **She say anything? Did she say tell me anything?** |
| PERRY: | Huh? |
| **BELL:** | **Did she tell me anything? I couldn't talk to her.** |
| PERRY: | No. She didn't say tell you anything; I'll tell ya that. But obviously, I'm not going to tell you everything I, I know. Okay? |
| BELL: | Right. |

(Del Estes re-enters the interview room and hands Bell a cup of water)

|  |  |
|---|---|
| PERRY: | Like I said, you know a small portion of what's going to be released to the public, okay? And it's enough to get a warrant for you... |
| BELL: | Uh huh. |
| PERRY: | Like I said, the highest bond possible that I've ever been involved with in twenty-five years, okay? Which is longer than you've been on the planet, okay? Uh, I mean I'm not bragging on it or anything like that. It's just, it's very high and it's very unique. Uh and like |

8

|         | I said, I'm not going to put every piece of information that we have into that affidavit, okay? |
|---------|---|
| BELL:   | Uh huh. |
| PERRY:  | For obvious reasons, okay? If you did want to tell me something, the only way I could verify if it was real is by information that we withhold, okay? |
| BELL:   | Right. |

(Emphasis added.)

After this exchange, the detectives continued their attempt to convince Bell to waive his previously asserted right to counsel. The detectives alternated between long monologues and back-and-forth discussions with each other, interlaced with Bell's short comments, such as "uh huh" or "right." Close to an hour after Bell entered the interview room, Bell said, "Alright, I'll talk." However, the detectives did not read Bell his Miranda rights at that time. A few minutes later, this exchange occurred:

| PERRY:  | Okay. For that to happen, you have to ask us. |
|---------|---|
| ESTES:  | It seems a little silly how … |
| PERRY:  | It does, but it … we can't ask you because you, you invoked your rights, okay? So … |
| ESTES:  | You have to either ask us or you have to say … |
| PERRY:  | "I would like to …" |
| ESTES:  | … "Hey man, I wanna talk to you guys." We … |
| PERRY:  | You understand that? And then I have to re-advise you of your rights and then you have to tell me you would like to talk to me. We don't make the rules. |
| ESTES:  | We don't make … it seems silly, but that's the way the court has said it has to be done. |
| PERRY:  | And I don't wanna go outside and then you blurt something to me and … |
| ESTES:  | Yeah. |
| PERRY:  | … and then I don't have this, because then … |
| BELL:   | What's that? |
| PERRY:  | Well I have to have, it's saying you wanna talk to me. |
| ESTES:  | Yeah, we have to—just like we did this morning. We have to advise you again of your rights, and then this time if you, if you do wish to talk to us … |
| BELL:   | Uh huh. |
| ESTES:  | … you have to say, where it says, "Having these rights in mind, do you wish to talk to me now?" You have to, you have to say, "Yes." But before we can even get to that, you have to either make |

9

>          the statement, "Hey, I want to talk to you guys." Or B, uh "Can I
>          talk to you guys?" Something like that, you know?
> BELL:    Can I talk to you?

Bell's final comment occurred one hour and three minutes into the conversation, according to the timestamp on the video. The detectives read Bell his <u>Miranda</u> rights, and Bell waived those rights. Bell subsequently confessed to shooting both victims.

## III.    Subsequent Procedural History

An amended information charged Bell with two counts of first-degree murder and one count of armed criminal action. Bell filed a motion to suppress his confession, contending *inter alia* that the detectives failed to cease their interrogation after Bell had invoked his right to counsel. The trial court issued a written "Order and Judgment on Motion to Suppress" denying Bell's motion.

Regarding the first conversation, the trial court found that Bell was well acquainted with the criminal justice system and that he clearly understood his right to remain silent. For the detectives' part, the trial court found that the detectives exercised no coercion upon Bell, but the detectives persisted in their subtle attempts to persuade Bell to talk. Nevertheless, the trial court concluded that Bell made no admissions; therefore, there were no statements to suppress from the first conversation.

Regarding the second conversation, the trial court concluded that Bell initiated the conversation with police. The trial court reasoned, "Bell's inquiry about his wife and girlfriend can fairly be said to represent a desire on his part to open up a more generalized discussion relating directly or indirectly to the investigation." The trial court determined that Bell's questions allowed the detectives to continue speaking to Bell even though Bell had not yet said, "Alright, I'll talk," and, "Can I talk to you?" The trial court also found that Bell's waiver of his Miranda rights was knowing and intelligent under the totality of the circumstances.

10

Before trial, Bell objected to the introduction of two State's exhibits. State's Exhibit #23 was the cocaine seized from Bell after his arrest; State's Exhibit #24 was the crime-lab report about that cocaine. Bell argued that these exhibits contained evidence of uncharged crimes, which was irrelevant and prejudicial. The trial court overruled Bell's objection.

The jury convicted Bell on all three counts. After denying Bell's motion for new trial, the trial court sentenced Bell to life in prison without the possibility of parole. This appeal follows.

## Points on Appeal

Bell raises two points on appeal. First, Bell argues that the trial court clearly erred by denying his motion to suppress the confession. Specifically, Bell contends that Detectives Perry and Estes obtained the confession during a custodial interrogation after Bell had already invoked his right to counsel. Bell further asserts that he did not reinitiate further communications, exchanges, or conversations with the detectives; thus, the detectives' attempts to persuade Bell to waive counsel were improper. Second, Bell argues that the trial court abused its discretion in allowing the State to introduce evidence about the cocaine found in Bell's pocket. Specifically, Bell contends that any evidence of his possession of cocaine was an uncharged crime, was both logically and legally irrelevant, and was prejudicial to him.

## Discussion

**I.      Point One—Bell's Confession**

Bell clearly invoked his right to counsel during his first conversation with the detectives. Notwithstanding Bell's request, Bell was not provided counsel. Twelve hours after Bell's request for counsel, the detectives removed Bell from his cell and brought him to an interview room. Still, no counsel was present. The detectives read the arrest warrant and supporting probable-cause statement to Bell. The detectives then continued to converse with Bell in an

11

attempt to appeal to his conscience and persuade Bell into waiving his right to counsel. Neither detective engaged in any express questioning of Bell during their interaction with him during this extended conversation. However, the nature and circumstances surrounding the detectives' actions and statements were the functional equivalent of express questioning, and constituted interrogation under the guidance announced in Rhode Island v. Innis, 446 U.S. 291, 301 (1980). The detectives' interrogation of Bell after he expressly invoked his right to counsel implicates Bell's constitutional rights as set forth in Edwards v. Arizona, 451 U.S. 477, 484–85 (1981).

A.     Standard of Review

We review a trial court's decision on a motion to suppress evidence to determine whether substantial evidence exists to support the trial court's ruling. State v. Byrd, 389 S.W.3d 702, 707 (Mo. App. E.D. 2012). We will reverse the trial court's judgment only if it is clearly erroneous. Id. To find clear error, an appellate court must be "left with a definite and firm belief a mistake has been made." State v. Haldiman, 106 S.W.3d 529, 533 (Mo. App. W.D. 2003). This Court considers the record made at the suppression hearing and at trial, and we "review all facts and reasonable inferences therefrom in the light most favorable to the trial court's decision." Byrd, 389 S.W.3d at 707. We defer "to the trial court's superior opportunity to determine the credibility of witnesses." Id. (quoting State v. Rousan, 961 S.W.2d 831, 845 (Mo. banc 1998)).

B.     Bell's Right to Counsel

In Miranda v. Arizona, the United States Supreme Court held that the now-famous Miranda warnings must occur before any custodial interrogation. 384 U.S. 436, 479 (1966). Among those warnings is the right of an accused to the presence of an attorney. Id. Miranda unambiguously dictated the procedure to which law enforcement must adhere once an accused invokes his or her right to an attorney: "the interrogation must cease until an attorney is present." Id. at 474.

12

Edwards v. Arizona reconfirmed Miranda's protection of individuals in custody who assert their right to counsel and provided persons accused of crimes with additional safeguards. 451 U.S. 477, 485 (1981). The Edwards Court held: "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Id. at 484. After invoking the right to counsel, authorities may not subject a defendant to further interrogation until either (1) counsel is present or (2) "the **accused himself initiates** further communication, exchanges, or conversations with the police." Id. at 484–85 (emphasis added). As the Arkansas Supreme Court articulately stated: "It is true that the accused person may change his mind and initiate further contact with the officers, but the **impetus** must come from the accused, not from the officers." Metcalf v. State, 681 S.W.2d 344, 345 (Ark. 1984) (emphasis added); see also, 2 LaFave, et al., Criminal Procedure, § 6.9(f), 945 (4th ed. 2015).

The implicit assumption of Edwards "is that the subsequent requests for interrogation pose a significantly greater risk of coercion." Maryland v. Shatzer, 559 U.S. 98, 105 (2010). The increased risk of coercion results from police persistence, but also from continued pressure that begins when an individual enters custody and that is likely to "increase as custody is prolonged." Id. (quoting Minnick v. Mississippi, 498 U.S. 146 (1990)). The fundamental purpose of the Edwards rule is to preserve the integrity of the accused's choice to communicate with police only through counsel. Id. at 106. Edwards accomplishes this purpose by "prevent[ing] police from badgering a defendant into waiving his previously asserted Miranda rights." Id. (quoting Michigan v. Harvey, 494 U.S. 344, 350 (1990)).

13

Here, the trial court found—and neither Bell nor the State dispute—that Bell unequivocally invoked his right to counsel during his first conversation with the detectives. Thus, the detectives constitutionally could not subject Bell to further interrogation while Bell was still in custody unless (1) Bell's counsel was present, or (2) **Bell initiated** further communication, exchanges, or conversations with police sufficient to allow police to resume an interrogation. The record is clear that the detectives resumed their conversations and questioning of Bell before Bell was provided an attorney. Accordingly, the core of our analysis is whether Bell initiated further communication with the detectives, and if so, had the detectives resumed their interrogation of Bell before or after Bell initiated the communication.

The United States Supreme Court addressed the initiation issue in Oregon v. Bradshaw, 462 U.S. 1039 (1983). While a four-member plurality of the Supreme Court wrote the principal opinion in Bradshaw, eight Justices agreed on a two-step analysis to determine whether an Edwards violation exists. See id. at 1048 (Powell, J., concurring). The first step is whether the defendant initiated a conversation. Id. If so, the second step is whether—under the totality of the circumstances—the defendant knowingly and intelligently waived the right to counsel. Id.

The Justices split four-to-four[9] in deciding parameters on what it means to "initiate" a conversation. The plurality opinion used the "ordinary dictionary sense of [initiate]." Id. at 1045. However, the plurality limited this definition by the *type* of conversation that would enable further interrogation:

> There are some inquires, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either the accused or a police officer, relating to routine incidents of the custodial relationship, will not generally "initiate" a conversation in the sense in which that

---

[9] Justice Powell, the ninth Justice, thought the two-step analysis was novel and would lead to confusion; thus, Justice Powell analyzed the issue entirely under the totality-of-the-circumstances test. Id. at 1050–51.

14

word was used in Edwards.

Id.

While the plurality opinion did not garner a majority, Missouri courts have relied on the plurality's test. See State v. Lyons, 951 S.W.2d 584, 590 (Mo. banc 1997); State v. Naumowicz, 923 S.W.2d 482, 486 (Mo. App. E.D. 1996). Here, the trial court found that Bell initiated a discussion under Bradshaw with the detectives based on two inquiries. First, before the detectives read Bell the arrest warrant, Bell asked, "You talk to my wife, or my girlfriend?" As the trial court noted, the detectives knew that Bell's girlfriend was in Bell's apartment at the time of the shooting and was a potential witness in the case. Second, after the detectives finished reading Bell the arrest warrant and probable-cause statement, Bell asked again, "You said you talked to my wife and my girlfriend?" Bell then asked three follow up questions of the detectives, including, "Did [girlfriend] tell me anything? I couldn't talk to her." Citing Bradshaw, the trial court found that Bell's inquiry about his wife and girlfriend could "fairly be said to represent a desire on his part to open up a more generalized discussion relating directly or indirectly to the investigation." Thus, the trial court found that Bell's inquiries initiated a discussion, which allowed the detectives to begin their effort "to coax Bell to talk." It is unclear from the trial court's order *which* of Bell's inquiries the trial court found initiated a discussion with the detectives under Bradshaw. Both of Bell's questions related to his wife and girlfriend. For purposes of our analysis, we will assume that the trial court found that *both* statements evinced Bell's willingness to have a general discussion about the investigation, and thus both of Bell's statements initiated a discussion. We will address each of Bell's inquiries in turn.

C.     Bell's First Inquiry about His Girlfriend

Even if Bell's first inquiry about his wife and girlfriend—"You talk to my wife, or my girlfriend?"—can be deemed sufficient to evince a willingness by Bell, directly or indirectly, to

15

have a general discussion about the investigation, the record is clear that Bell did not initiate this discussion. To the contrary, police initiated the discussion about both Bell's wife and girlfriend. The record shows that a few hours before the detectives' second conversation with Bell, Commander Meadows told Bell that Bell's wife had called the station a few times. Then, just before Bell mentioned his wife or girlfriend during the second conversation, Det. Perry told Bell, "Just talked to your girlfriend." Bell interrupted Det. Perry a few sentences later: "You talk to my wife, or my girlfriend?" We are not persuaded that Bell's clarifying response to Det. Perry's comment initiated a general discussion about the investigation within the ordinary dictionary sense of the word. See Bradshaw, 462 U.S. at 1045. Stated differently, the impetus to discuss Bell's girlfriend originated with Det. Perry, not Bell. See Metcalf, 681 S.W.2d at 345. Therefore, Bell's first inquiry about his wife and girlfriend did not meet the requirements for initiating a conversation under the plurality opinion in Bradshaw.

D.    Bell's Second Inquiry about His Girlfriend

The State also contends that Bell waived his Miranda rights by initiating a discussion with the detectives during the second conversation when Bell inquired about his girlfriend a second time. After Bell asked for water and Det. Estes left the room to retrieve it, this exchange occurred between Bell and Det. Perry:

| | |
|---|---|
| BELL: | You said you talked to my wife and my girlfriend? |
| PERRY: | Uh, I didn't talk to her but other officers did. |
| BELL: | Okay. |
| PERRY: | Uh, they talked to your wife early on this morning because I know she showed up at the location that the … at 401 South Pacific and that was early, early, early. |
| BELL: | Okay. |
| PERRY: | Or late, late however you want to look at it uh when I first … I went there before I came here this morning. |
| BELL: | Okay. |
| PERRY: | And you were already in custody, so. |
| BELL: | And my girlfriend? |
| PERRY: | Uh she just left here. |

16

```
BELL:       She say anything?  Did she say tell me anything?
PERRY:      Huh?
BELL:       Did she tell me anything?  I couldn't talk to her.
PERRY:      No.  She didn't say tell you anything; I'll tell ya that.  But
            obviously, I'm not going to tell you everything I, I know.  Okay?
BELL:       Right.
```

### 1. Trial Court's Finding that Bell Initiated a Subsequent Discussion is Reasonable

The contention that this exchange constitutes the required initiation of a discussion under Bradshaw is strong for two reasons.  First, unlike Bell's first inquiry, here Bell broached the topic of girlfriend without any prompting from the detectives.  Thus, the trial court reasonably could conclude that Bell initiated a conversation in the ordinary dictionary sense of the word "initiate."  See Bradshaw, 462 U.S. at 1045.  Second, the record is clear that with this second inquiry, Bell asked *what* his girlfriend might have said.  Viewed in a light most favorable to the trial court's ruling, Bell reasonably could be seen as inquiring about the State's evidence against him because he sought information that his girlfriend, a potential witness, might have given the police.  Thus, the trial court's finding—that Bell's second inquiry about his girlfriend evinced a willingness, at least indirectly, to have a general discussion about the investigation—was plausible.  See Bradshaw, 462 U.S. at 1045.

### 2. Bell's Second Inquiry Occurred After Police Initiated the Interrogation

However, even accepting the trial court's finding that Bell's inquiry regarding his girlfriend initiated the subsequent interrogation with the detective, the record before us shows that the detectives had already begun their interrogation of Bell *before* Bell's second inquiry about his girlfriend.  Under the clear mandate of Edwards, police can only begin an interrogation *after* the defendant initiates such a discussion.  451 U.S. at 484–85.

17

In a Miranda analysis, an interrogation refers not just to express questioning of an accused. An interrogation also includes the "functional equivalent" of express questioning, meaning "any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). An incriminating response is any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial. Id. at 301 n.5. The primary focus of this analysis is upon the perceptions of the suspect, not the intent of police; but at the same time, we do not hold police accountable for the unforeseeable results of their words or actions. Id. at 301–02.

The State relies heavily on United States v. Allen, 247 F.3d 741 (8th Cir. 2001), *cert. granted, judgment vacated on other grounds*, 536 U.S. 953 (2002), for the proposition that the detectives' reading of the arrest warrant and probable-cause statement was simply the presentation of a statement of facts that was not reasonably likely to elicit an incriminating response from Bell. In Allen, the defendant invoked his right to counsel around 3:00 a.m., and police immediately ended the interrogation. Id. at 764. The next morning, an officer asked Allen if he still wanted participate in a lineup given his request for counsel, and Allen agreed to participate without counsel. Id. After the lineup, police informed Allen of the results of the lineup: three of the four witnesses had placed him at the scene of the crime. Id. Allen then asked to speak with a detective and subsequently confessed. Id. On appeal, Allen argued that his confession should have been suppressed because he had invoked his right to counsel and that telling him of the results of the lineup was the functional equivalent of interrogation under Innis. Id. at 765. The Eighth Circuit held that Innis did not require the confession to be suppressed because the detective's statement about the lineup was not reasonably likely to elicit an

18

incriminating response. Id. Instead, the Eighth Circuit characterized the officer's statement as "a statement of fact and **not a plea to conscience.**" Id. (Emphasis added.) "Informing a suspect that he has been identified in a lineup contributes to the intelligent exercise of his judgment and may likely make firm his resolve to refuse to talk to the police without counsel." Id. Moreover, keeping a suspect informed should be encouraged rather than discouraged, "so long as the communication is truthful, and is not designed, nor is it likely to elicit, an incriminating response." Id. at 765–66. On those facts, the Eighth Circuit found that no police interrogation occurred. Id. at 766.

We find the facts of Allen distinguishable from the facts before us, and conclude that Allen actually supports Bell's argument. Here, contrary to the facts in Allen, the detectives made repeated pleas to Bell's conscience, and did not limit their communication to the recitation of facts that would keep Bell informed of the progress of the investigation. See id. at 765. The detectives retrieved Bell from his cell and placed him in an interview room. Even if we were to hold that reading the arrest warrant and the probable-cause statement in an interview room was conduct "normally attendant to arrest and custody," and thus was not interrogation[10] under Innis, 446 U.S. at 301, the record shows that the detectives went far beyond simply reading facts when resuming their communication with Bell.

After reading the warrant, Det. Perry said, "Man, you're a calm dude to sit there after hearing that." Det. Perry then stated, "I tried to express to you earlier about having the opportunity to put your side out when we've been working with the Major Case Squad all day."

[10] The trial court found that officers were required to read the warrant to Bell per department policy and Section 544.180. After a plain reading of Section 544.180, we are not convinced that the statute requires police to remove a defendant—who has invoked his right to counsel numerous times—from his cell, bring the defendant to an interview room, and spend more than 10 minutes (per the timestamp on the video) reading the evidence of the crime. Further, Det. Perry admitted that *anyone* could have read Bell the warrant, but Det. Perry said he wanted to read the warrant personally because "if [Bell] did want to talk, I did want to be present." Det. Perry also admitted that nothing required him to read the probable-cause statement, but that he chose to do so on his own. Not coincidentally, the probable-cause statement outlined much of the State's evidence.

19

After reading the probable-cause statement that detailed all of the facts of the crime and with no response from Bell, Det. Perry told Bell that the media would soon have all the facts. Det. Perry said, "So everybody in the City of Cape will have [the probable-cause statement] by tonight because I've already given that to our public relations officers ... So, I wanted to make sure that you understood that there's a lot of information and evidence that points to you and probable cause to get a warrant." Det. Perry continued, "I've been doing this for over twenty-five years and that's the largest bond amount I've ever seen on a case that I've been involved in." Clearly trying to avoid an Edwards violation, Det. Perry said, "I'm not going to ask you if you want to, I will tell you if you would like to give any information, and if you ask me ... you would like to talk to me, you would like to give your version or account of what transpired over there; all you have to do is ask me." Det. Perry also carefully stated, "I'm not going to ask you any questions, but I'm gonna tell you this is a mild piece of the information that we do have, okay?"

Important to our analysis and holding, each of the detectives' statements occurred **before** Bell asked about his girlfriend the second time. The State's argument that the detectives merely provided Bell with facts of the type found permissible in Allen is unavailing because the detectives clearly went beyond merely stating facts, but made numerous pleas to Bell's conscience[11] in a deliberate attempt to coax Bell into waiving his right to counsel. The detectives should have known (and they most certainly did know) that these statements were reasonably likely to provoke Bell into a response, to waive his right to counsel, and to produce a statement that the prosecution could use at trial. See Innis, 446 U.S. at 301. The detectives' numerous appeals to Bell's conscience, made in an interrogation room and after detailing the evidence against Bell, were the functional equivalent of express questioning. We hold the detectives' statements constituted an interrogation of Bell under Innis.

---

[11] Or, as Det. Perry put it in his testimony, "logical reasons of why we would like to have his statement."

20

The State also suggests State v. Myers allows some continued communication with an accused who has invoked the right to counsel. 291 S.W.3d 292 (Mo. App. S.D. 2009). The distinct and particular facts of Myers preclude this opinion from offering any guidance in the matter before us. In Myers, two officers were interrogating Myers when he invoked his right to counsel. Id. at 296. Instead of immediately leaving the room, one officer made several comments including telling Myers this would be his last chance to talk and asking Myers whether what occurred was self-defense. Id. at 296–97. The videotape showed that Myers recognized the officers were leaving. Id. at 297. After it was clear that the officers were going to allow Myers to assert the right to counsel, Myers raised his hands as a gesture to the officers to stop leaving the room. Id. Myers said he was ready to talk and subsequently waived his right to counsel. Id. The Southern District held substantial evidence supported the trial court's finding that Myers reinitiated the conversation. Id. at 297. The Southern District relied heavily on the trial court's detailed findings that (1) even with the officers' continued comments, the officers respected Myers's rights and began to leave the room within one minute after the accused asked for legal counsel, and that (2) only after it was "very obvious" to Myers that the officers were leaving, were ending the interrogation, and were going to allow Myers to assert his right to counsel did Myers then initiate the discussion with the detectives. Id. at 296–97. The facts in Myers demonstrate that the impetus to reinitiate the conversation—after it was clear to Myers that the interrogation was ending—was on Myers when he raised his hands, stopped the officers from leaving, and said he was going to talk. See Metcalf, 681 S.W.2d at 345. Conversely, it was not obvious at all that the detectives here were ending their interrogation and respecting Bell's rights. Bell asked about his girlfriend *during* an ongoing interrogation, not prior to the detectives' resumed interrogation. The circumstances of the continued contact between the

21

detectives and Bell violated Edwards's prohibition against law enforcement's subsequent interrogation of an accused absent counsel unless the accused initiates further conversation. 451 U.S. at 484–85.

The underlying rationale of Edwards further supports our conclusion that the detectives violated Bell's rights. Preventing badgering police conduct is precisely the rationale for the Edwards rule. See Shatzer, 559 U.S. at 106; Naumowicz, 923 S.W.2d at 486 (in affirming the trial court's denial of the defendant's motion to suppress, we found it significant that the case presented "no evidence of police badgering, which was the prime concern of Edwards" (Emphasis added.)). Here, Bell was badgered after he invoked his right to counsel. During the first conversation with the detectives, Bell asserted his right to counsel several times over a thirty-five-minute conversation before the detectives finally respected Bell's decision. Later the next morning, Cpl. Bonham continued his attempts to persaude Bell to talk by telling Bell how the jury might perceive the incident, that this was a ruthless killing, that Bell had some problems, and that the jury would have no mercy if it did not know what happened. A few hours later, Det. Perry and Det. Estes took Bell into another interview room, where they outlined the evidence and made multiple appeals to Bell's conscience as stated above. Bell finally agreed to talk only after an hour into that second conversation. This type of badgering conduct occurred after Bell requested counsel, but before counsel was provided. While we respect the need of law enforcement to investigate crimes and secure confessions, the Constitution requires law enforcement to respect the rights of accused persons in custody who request legal counsel.

In conclusion, it is undisputed that Bell invoked his right to counsel during his first conversation with the detectives. The detectives' ongoing statements made during their second conversation with Bell were the functional equivalent of express questioning, and they

22

constituted interrogation under Innis. Because police already had resumed their interrogation when Bell asked about his girlfriend the second time, Bell did not "initiate" the conversation with the detectives under Edwards. Instead, the detectives improperly interrogated Bell after his request for counsel, and this improper interrogation led to Bell's confession. The detectives' violation of Edwards v. Arizona required the suppression of Bell's confession. The trial court's judgment allowing the confession into evidence was clearly erroneous.

### E. Harmless Error

Having determined that the trial court erred in admitting Bell's confession, we must determine whether that error was harmless. State v. Samuels, 965 S.W.2d 913, 920 (Mo. App. W.D. 1998). "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." State v. Whitfield, 107 S.W.3d 253, 262 (Mo. banc 2003) (superseded on other grounds by State v. McLaughlin, 265 S.W.3d 257, 262 (Mo. banc 2008)) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)). The application of harmless error is based on a continuum that is not subject to absolutes. State v. Ramirez, 447 S.W.3d 792, 798 (Mo. App. W.D. 2014).

> In fashioning a harmless-constitutional-error rule, we must recognize that harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence, or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one. What harmless-error rules all aim at is a rule that will save the good in harmless-error practices while avoiding the bad, as far as possible.

Chapman, 386 US. at 22–23.

An underlying purpose of the harmless-error rule is to safeguard an otherwise valid conviction when the reviewing court can confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt. This doctrine "recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the

23

defendant's guilt or innocence and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986) (internal citation omitted). We consider and quantitatively assess these trial errors in the context of the other evidence presented at trial to determine if the error is harmless beyond a reasonable doubt.

Bell was charged with first-degree murder for killing both James and Cole. However, the trial court also instructed the jury on the lesser-included charge of second-degree murder for both victims. To find Bell guilty of second-degree murder under the instructions submitted by the trial court, the jury had to find (1) that Bell caused the death of the victims, and (2) that Bell knew his conduct was practically certain to cause the death of the victims. See Section 565.021.1(1). To find Bell guilty of first-degree murder, the jury had to find the elements of second-degree murder and additionally that Bell engaged in the conduct after deliberation, which "means cool reflection for any length of time no matter how brief." See Section 565.020.1; Section 565.002(3).

Overwhelming evidence, untainted by Bell's confession, leads us to conclude that the admission of Bell's confession at trial was harmless error insofar as it applied to second-degree murder. Two witnesses saw Bell and James bump into each other shortly before the murders. One witness, Marshall, saw Bell brandishing a gun inside the foyer of the apartment building seconds before the murders. Marshall saw James walk past Bell while Bell was holding a gun, and Marshall heard gunshots just moments later as he was walking away from the apartment building. Shortly after the murders, police saw Bell near the scene and apprehended him after a pursuit. The physical evidence also overwhelmingly pointed to Bell as the shooter. Officers found Cole's body in the doorway leading into her shared apartment with James; officers found

24

James's body inside the apartment. Numerous spent bullets and bullet casings were found around the bodies and the foyer; the spent casings were the R & P Luger 9mm brand. Officers found both live ammunition and spent casings of that same brand in Bell's apartment. Officers found a gun on the roof of the building next-door. The gun found by the officers fit inside a holster found in Bell's apartment. All bullets inside that gun's magazine were the R & P Luger 9mm brand found at the scene of the murders and in Bell's apartment. A criminalist testified that the spent shell casings inside the victims' apartment were fired from the discovered gun, and that the bullets were consistent with being fired from that gun. DNA found on the gun matched Bell's DNA. Bell also tested positive for gunshot residue at the police station shortly after his arrest. No evidence suggested the possibility of another shooter.

To be sure, the evidence recited above is circumstantial in that there was no witness who saw the actual shooting. But such evidence overwhelmingly supports a conviction of murder in the second degree, even absent Bell's confession, and circumstantial evidence may properly support a conviction. See, e.g., State v. Baker, 859 S.W.2d 805, 813 (Mo.App. E.D. 1993) ("All of the elements of a homicide case including the corpus delicti may be proved with circumstantial evidence."); State v. Hutchison, 957 S.W.2d 757, 767 (Mo. banc 1997) ("Circumstantial evidence is afforded the same weight as direct evidence.").

Chapman rejects the prospect of automatic reversal upon a finding of constitutional error and directs a harmless-error standard that weighs the relative harm of improperly admitted evidence to the presence of other evidence of guilt. Ramirez, 447 S.W.3d at 798. While acknowledging the impact that Bell's confession may have on a jury, we remain convinced that the suppression of Bell's confession would have had no impact on the jury's decision to find the facts necessary to support a conviction of murder in the second degree. Accordingly, we

25

conclude that admitting Bell's confession was harmless error beyond a reasonable doubt with respect to second-degree murder.

While we are firm in our holding that the trial court's failure to suppress Bell's confession was harmless error as to the the charge of murder in the second degree, we are not so persuaded when considering the potential impact of the confession on the charge of murder in the first degree. We find ourselves in a similar situation to the court in Samuels, 965 S.W.2d at 922, because we are unwilling to conclude that admitting Bell's confession was harmless beyond a reasonable doubt with respect to the additional element—deliberation—required for first-degree murder. We acknowledge that, from the evidence in the record, the jury could have inferred that Bell murdered the victims with deliberation even without hearing evidence of his confession. See e.g., Samuels, 965 S.W.2d at 922 (inference of deliberation from multiple gunshot wounds); State v. Howard, 896 S.W.2d 471, 481 (Mo. App. S.D. 1995) (inference of deliberation when the defendant left scene immediately after the shooting without checking on the victim or procuring aid). However, Bell's confession provided substantial evidence of deliberation that no other evidence could provide. Over the course of 34 pages of transcript, Bell walked the detectives through the shootings.

Many of Bell's admissions were particularly probative of deliberation. For example, rather than only shooting Cole and James from the foyer, Bell admitted seeing Cole go down in the doorway and then shooting her one more time while she was on the ground. Bell also admitted that James was already shot and down on the floor inside the apartment, but that Bell walked around Cole's body and shot James "a couple more times." Bell's statements strongly indicated that Bell murdered Cole and James with deliberation after cool reflection. While the jury might have inferred the required deliberation from the evidence minus Bell's confession, we

26

are unable and unwilling to hypothesize the full impact of Bell's highly probative statements on the jury's finding of required element of deliberation. See Samuels, 965 S.W.2d at 923. Therefore, we cannot conclude that the admission of Bell's confession was harmless beyond a reasonable doubt with respect to the deliberation element of first-degree murder.

F.    Remedy

Having determined that admitting Bell's confession was harmless beyond a reasonable doubt with respect to second-degree murder, but not with respect to the deliberation element required to convict Bell of first-degree murder, we must determine the appropriate remedy upon remand. Given the same question, the Samuels Court entered an order reversing the trial court's judgment and remanding the case for a new trial. 965 S.W.2d at 923. While this course of action provides one proper remedy, we are not so limited in addressing the particular circumstances presented by the facts of this case.

In State v. Roe, this Court was presented with an analogous factual context. 6 S.W.3d 411 (Mo. App. E.D. 1999). In Roe, we held that the trial court committed plain error by submitting a defective verdict director for first-degree murder. Id. at 416. The verdict director erroneously allowed the jury to convict the defendant of first-degree murder only by finding the requisite intent for second-degree murder. Id. at 415. We recognized that the trial court's error required reversal of defendant's convictions for first-degree murder and armed criminal action. Id. at 416. However, we also noted that the jury had found each of the prerequisite elements for second-degree murder despite using the defective verdict director. Id. at 417. We acknowledged that the traditional remedy was simply remanding the matter for a new trial, but believed that policy considerations justified an alternative remedy. Id. We noted, "It is fundamental that the appellate remedy should extend no further than the scope of the wrong." Id.

27

We reasoned that the defective jury instruction contained all of the requisite elements of second-degree murder. Id. Further, because the jury was instructed in both second-degree murder and armed criminal action, the defendant had full notice and a complete opportunity to defend against the lesser-included charges. Id. Finally, the defendant was a prior offender, which made sentencing a question for the judge rather than the jury. Id. Thus, the erroneous instruction did not foreclose any expectation of the defendant that the jury would assess his sentence. Id. Given the policy considerations, we found that remand for a new trial would exceed the scope of the wrong and would represent a windfall to the defendant, who received a "perfectly fair trial as to second-degree murder and armed criminal action." Id. at 417–18. As a remedy, we remanded the case and allowed the State to elect, within sixty days from the issuance of our mandate, whether to retry the defendant on all charges or to accept the lesser convictions for second-degree murder and armed criminal action. Id. at 418.

The Western District has cited Roe in rejecting the traditional remedy of a remand for new trial. State v. Neal, 328 S.W.3d 374 (Mo. App. W.D. 2010). In Neal, the trial court erred by submitting the second-degree robbery instruction on a charge of first-degree robbery. Id. at 383. Thus, the instructions allowed the jury to convict on first-degree robbery while requiring the jury to find only the elements of second-degree robbery. Id. Following the rationale of Roe, the Court found that the remedy of a new trial exceeded the wrong of the improper instruction and that the defendant received a fair trial on second-degree robbery. Id. at 384. Unlike Roe, the Neal Court found that because the State erred in providing the trial court with the improper instruction, the State should not be provided the windfall of the option to retry the defendant on first-degree robbery. Id. at 385. The Western District noted, "The parties, the victims, the jurors and the citizens of the State have an interest in having cases fully and finally decided. Neither

28

judicial economy nor the rights of the parties would be served by granting either party a new trial in this matter." Id. Therefore, the Court reversed the defendant's conviction of first-degree robbery, and the Court remanded with instructions to enter a judgment of conviction for second-degree robbery and to resentence the defendant accordingly. Id.

We find the remedy that Roe crafted to be appropriate and just here. Our traditional remedy in this situation would be to reverse each of Bell's convictions and to remand for a new trial. See Samuels, 965 S.W.2d at 923. However, we reiterate that it is fundamental for the appellate remedy to extend no further than the scope of the wrong. Roe, 6 S.W.3d at 417. The wrong here was admitting Bell's confession, which *was not* harmless with respect to the jury's conviction on first-degree murder but *was* harmless with respect to second-degree murder. Because we found Bell's confession to be harmless with respect to the lesser-included second-degree murder, such a lesser-included conviction was constitutionally permissible. Thus, depriving the State of a conviction based on second-degree murder exceeds the scope of the wrong because only a conviction for first-degree murder was impermissible. 6 S.W.3d at 417. The other policy considerations identified in Roe also support our remedy. Because second-degree murder is a lesser-included offense to first-degree murder, the jury found each element of second-degree murder beyond a reasonable doubt. Id. Because the trial court instructed the jury here on second-degree murder for the deaths of James and Cole, Bell had the opportunity to defend himself against those charges. Id. Further, the trial court found Bell to be a prior felony offender, so Bell's confession did not alter any expectation he might have had in the jury assessing his sentence. Id.

Given the circumstances of this case, we find the remedy applied by this Court in Roe to be particularly appropriate. Accordingly, we reverse Bell's convictions of first-degree murder

29

for the deaths of both victims and his conviction of armed criminal action for the death of Cole. We remand the case with directions to the trial court under Rule 30.22. The trial court is directed to allow the State to elect, within sixty days of our mandate, either (1) the traditional remedy of a retrial on all counts, including first-degree murder, or (2) to accept the lesser convictions for second-degree murder for the killing of both victims, and armed criminal action in connection with second-degree murder for the death of Cole. If the State elects to accept the lesser convictions, the trial court is directed to enter judgment and resentence Bell accordingly.

## II. Point Two—Uncharged Bad Acts

We note at the outset that this point is moot if the State elects to retry Bell, as Bell will have received the new trial that he desires. However, we must review Point Two because it is a live issue if the State elects to accept the lesser charges of second-degree murder and armed criminal action.

### A. Standard of Review

The trial court has broad discretion in determining the admissibility of evidence, and we will not disturb its ruling absent a clear abuse of that discretion. State v. Johnson, 207 S.W.3d 24, 42 (Mo. banc 2006). The trial court abuses its discretion when a ruling is "clearly against the logic of the circumstances then before the court, and is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." State v. Roggenbuck, 387 S.W.3d 376, 382 (Mo. banc 2012).

However, finding that "the trial court erred in admitting evidence does not end the inquiry." State v. Barriner, 34 S.W.3d 139, 149 (Mo. banc 2000). We only reverse if we determine the improper admission was outcome-determinative. Id. at 150. A finding of outcome-determinative prejudice "expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of the

30

evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence." Id. (quoting State v. Roberts, 948 S.W.2d 577, 592 (Mo. banc 1997)). In determining whether outcome-determinative prejudice exists, we consider several factors: the overwhelming nature of the properly admitted evidence, the similarity of the charged offenses to the improperly admitted evidence, the amount of improperly admitted evidence, the extent the prosecution relied on or highlighted the improperly admitted evidence, and the prosecutions intention—whether deliberate or inadvertent—in eliciting the improper evidence. Id. at 150–151.

B. Uncharged Bad Act

Bell argues that the trial court abused its discretion in admitting evidence that police found Bell in possession cocaine after he was arrested. Bell asserts that such evidence was irrelevant to the issue of whether he murdered the victims and was thus inadmissible as an uncharged bad act. We agree, but we also conclude that the admission of the uncharged bad act did not result in outcome-determinative prejudice to Bell.

Generally, evidence of prior uncharged crimes and prior bad acts is inadmissible to show the defendant's propensity to commit such crimes. State v. Bernard, 849 S.W.2d 10, 13 (Mo. banc 1993). Despite this general rule, prior misconduct that is both logically and legally relevant is admissible. Barriner, 34 S.W.3d at 144. "Evidence is logically relevant if it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial. Evidence is legally relevant if its probative value outweighs its prejudicial effect." Id. at 144–45 (internal citation omitted).

Several exceptions exist under which otherwise inadmissible evidence may be relevant for a different purpose. State v. Primm, 347 S.W.3d 66, 70 (Mo. banc 2011). Such evidence may be admissible if it tends to establish motive, intent, the absence of mistake or accident, a

31

common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, or the identity of the person charged with commission of the crime on trial. Id. Additionally, evidence of uncharged crimes that is part of the circumstances or the sequence of events surrounding the offense charged may be admissible "to present a complete and coherent picture of the events that transpired." Id.

In State v. Burnfin, 771 S.W.2d 908, 910 (Mo. App. W.D. 1989), the defendant was convicted of second-degree murder and armed criminal action. Id. During trial, the State elicited evidence that the defendant was smoking marijuana with his companions when the crime occurred. Id. at 911. The State also commented on this evidence during opening statements and closing argument. Id. On appeal, Burnfin argued that evidence of him smoking marijuana was improper because it constituted evidence of uncharged crimes. Id. at 910. The Western District held, "the fact that Burnfin had been smoking marijuana the night in question had no bearing whatever on any of the facts in issue and had no tendency to prove Burnfin guilty of homicide." Id. at 911. The Court concluded that the sole purpose for the evidence "was to portray Burnfin as a dope user and to thereby prejudice his cause before the jury." Id. Thus, admission of this evidence was improper. Id.

Following the rationale in Burnfin, the fact that officers found cocaine in Bell's pocket had no bearing whatsoever on any of the facts at issue and had no tendency to prove that Bell murdered James and Cole. Bell's possession of cocaine was neither logically nor legally relevant to whether Bell committed murder.

Further, the contention that Bell's cocaine possession was direct evidence of potential motive, intent, and identity is untenable. The State notes that defense counsel characterized James as angry when he bumped into Bell because of a prior "drug deal gone bad that day," and

32

subsequently elicited evidence that someone had stolen drugs from James. Further, defense counsel elicited testimony that investigators found individual packets of marijuana and cocaine on James's dead body. The State's implication is that Bell's possession of cocaine had some relevance to the already-admitted evidence of James selling or using drugs, which might have lent some probative value to Bell's motive or intent to murder James. But this argument fails absent any evidence connecting Bell's possession of drugs to James. For example, Bell's cocaine possession might have some relevance to Bell's motive, intent, or identity if evidence suggested that Bell had bought or stolen drugs from James in the alleged "drug deal gone bad." However, the State explicitly rejected any such connection in closing argument by stating that James and Bell were "[t]wo virtual strangers on the street" when they bumped into each other. Because we discern no relevance between Bell's possession of cocaine and his alleged murder of James, the trial court abused its discretion in admitting that evidence.

Despite the trial court's abuse of discretion, we conclude that the error was not outcome-determinative. For the reasons stated in our "Harmless Error" section above, the jury had overwhelming evidence to convict Bell of second-degree murder and armed criminal action, even excluding evidence of his cocaine possession. Bell's cocaine possession did not relate directly to murder, so it is unlikely that the jury attached significant probative value to the improperly admitted cocaine evidence. See Barriner, 34 S.W.3d at 150. Additionally, the State offered only two exhibits reflecting Bell's cocaine possession and did not refer to the evidence during closing arguments. Id. at 151. While we recognize that the State deliberately elicited the cocaine evidence, the State did not highlight the evidence in its presentation to the jury. Id.

Because the State presented overwhelming evidence of Bell's guilt as to second-degree murder, and because the evidence of Bell's cocaine possession played a minimal role in the trial,

33

we conclude that there is *no* "reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence." Barriner, 34 S.W.3d at 150. Accordingly, the trial court's error was not outcome-determinative. Point Two is denied.

### Conclusion

The trial court's judgment is reversed and remanded with directions in accordance with Rule 30.22. The trial court is directed to allow the State to elect, within sixty days from the issuance of the mandate, either to retry Bell on all issues within the charges of murder in the first degree and armed criminal action, or to accept the lesser convictions of murder in the second degree and armed criminal action.

*Kurt S. Odenwald*
_____
KURT S. ODENWALD, Judge

Sherri B. Sullivan, P.J., concurs.
Lisa P. Page, J., concurs.

34