

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD85549** |
| | ) | |
| **V.** | ) | **OPINION FILED:** |
| | ) | **SEPTEMBER 10, 2024** |
| **DAKKOTA SIDERS,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable Bryan Round, Judge

Before Division Four:  Anthony Rex Gabbert, Chief Judge, Presiding, Lisa White
Hardwick, Judge and Gary D. Witt, Judge

Dakkota Siders appeals the judgment of the Circuit Court of Jackson County,
Missouri ("trial court"), finding him guilty, after a jury trial, of second-degree murder,
unlawful use of a weapon, and two counts of armed criminal action.  On appeal, Siders
claims the trial court erred by overruling his motion to suppress and admitting into
evidence a gun found in his home and plainly erred in failing to read a mandatory jury
instruction to the jury at the outset of the trial.  We affirm the judgment of the trial court.

## Factual and Procedural Background

On January 16, 2019, Siders and two of his friends went to a pool hall in Sugar Creek that they sometimes frequented. J.W.[1], the general manager of the pool hall, was working that evening, and Siders asked him if he would like to accompany them to the Shady Lady nightclub in Kansas City after J.W. closed the pool hall. J.W. agreed to accompany the other three men, and they left in Siders's Kia vehicle. After the men had been at the Shady Lady for a while, someone came up to Siders and J.W. and told them that their other two companions were in an altercation in the parking lot.

Siders and J.W. left the Shady Lady and went out into the parking lot and witnessed the ongoing altercation. J.W., not wanting to be involved, got in the front passenger seat of Siders's car. J.W. saw the men with whom his companions were arguing go to their vehicle and grab guns. J.W. ducked down when he saw the guns. He heard several gunshots but did not see who fired them because he had ducked down. Siders and one of the other two companions got into the car with Siders driving. They drove at a high rate of speed, following the other vehicle, which was white, and going onto I-70. J.W. heard Siders say, "They're not gonna disrespect me like this." "Within seconds" of getting onto the interstate, J.W. saw Siders pull a gun from his waistband. J.W. saw Siders point the gun out of the car window and heard two or three shots.

---

[1] Pursuant to section 509.520, RSMo. (2023), we do not include the names of witnesses other than parties.

Surveillance video from downtown Kansas City shows a Kia vehicle pulling up to a different white vehicle being driven by B.H. ("Victim"), who had just left her job at the nearby post office. Victim was hit by two bullets fired from Siders's vehicle. Victim's car crashed into a nearby embankment and Victim died of her injuries. Siders's vehicle immediately exited the highway after the shots were fired. The shell casings law enforcement found on the highway near Victim's car were nine-millimeter shell casings which matched those found in the Shady Lady parking lot. J.W. testified that after the shots were fired and Siders exited the highway, the group went back to an area near the Shady Lady where they picked up the fourth member of their party, and J.W. got out of the car and called someone to pick him up.

Surveillance video from various Kansas City locations also shows Siders firing shots in the parking lot of the Shady Lady and then getting into the driver's side of his Kia and driving toward I-70; Siders driving up to Victim's car, driving almost parallel to it and then exiting onto Harrison Street while Victim's car travels off the road; Siders's vehicle is then captured on cameras driving erratically and heading east, on several different streets. The Kia was picked up on two different license plate reading cameras, and Department of Revenue records identified the vehicle as belonging to Siders, and it was registered to an address in Independence.

After Victim's death, police fairly quickly obtained the relevant surveillance footage and recovered the shell casings from both shooting locations; by later that day, officers conducted surveillance of Siders's Independence residence. While police were watching, Siders arrived at his residence in his Kia and went inside. Siders exited the

3

residence a short time later, and officers arrested him and searched his person. During the search of his person the officers found two firearms, one of which was a nine-millimeter handgun.

Subsequently, officers applied for and obtained a search warrant for Siders's residence, where a .45 caliber pistol was found. Siders was originally charged with first-degree murder for shooting Victim; unlawful use of a weapon for shooting from a motor vehicle and causing death; two associated counts of armed criminal action; three counts of unlawful possession of a firearm for the three different handguns found in the searches of Siders and his residence while Siders was a convicted felon; delivery of a controlled substance for possessing more than thirty-five grams of marijuana with intent to deliver it; and unlawful use of a weapon for possessing a firearm while also possessing marijuana.

Before his trial, Siders filed a motion to suppress evidence, alleging that his arrest was illegal in that at the time of his arrest there was not sufficient probable cause that he committed the shooting that caused Victim's death. After the trial court granted the motion and suppressed the evidence obtained from the search of his person following Siders's arrest, the prosecutor dismissed four counts against Siders, leaving only the murder count, the unlawful use of a weapon count, two armed criminal action counts, and the unlawful possession of a firearm count that pertained to the firearm found in Siders's residence pursuant to the search warrant

Siders also filed a motion to suppress the evidence seized as a result of the search warrant for his home. Following a hearing, the trial court denied that motion to suppress.

4

During the trial, the trial court realized it had "neglected to give [instruction MAI] 400.06 prior to reading Instructions 1 and 2."[2] The court continued:

[Court:] It would appear that situation involving the giving or failure to give an instruction or verdict form is in violation of this rule, which is 28.02 or any applicable notes on use, constitutes error. The error's prejudicial effect to be judicially determined provided that objection has been made pursuant to Rule 28.03. [Defense Counsel], what is you and your client's position with respect to proceeding in the absence of the Court having given having failed to give 400.06?

[Counsel:] Your Honor, we are not objecting, nor are we seeking a mistrial based on the Court's failure to give 400.06.

[Court:] All right.

[Counsel:] Our position is that we would like to proceed with the current trial as-is, Your Honor. I have huddled with my client about this and we are in agreement. I can have him confirm that for Your Honor for the record if you would like.

[Court:] I would like to swear him in and inasmuch as this could potentially have 29.15 implications, I just want to make sure that he is ratifying that decision on the record.

[Counsel:] Judge, I don't think it is appropriate to swear him in at this time. I mean, the defendant is standing here with me in court. I don't know that it is necessary to ask him to make any sort of position with regard to 29.15 or 24.035.

[Court:] But if he doesn't tell me this under oath, then it [is] not a sound presentation of whatever his opinion is.

[Counsel:] That's okay. I represent him. I am his attorney. I don't think the Court needs to hear from him on whether we object or whether we make certain motions. At times, yes.

[Court:] I think generally that is correct. But this is a little bit different. On its face, it is error. The rule says that.

---

[2] MAI 400.06 is normally read immediately after the jury is sworn and provides information regarding the order in which the trial will proceed.

5

[Counsel:] Yes.

[Court:] And you have told me that you are not going to object and I accept that.

[Counsel:] Yes.

[Court:] However, I think it is appropriate and necessary frankly, to have Mr. Siders say if he does object or he doesn't object. Either way. And I think that needs to be done under oath just like any other kind of testimony. We wouldn't accept any other testimony in this court that wasn't provided under oath.

If you are not going to let him do it, that is fine I mean, that is your right. That is your—you know, you are making your best professional decision and I respect it and I will live by it. But that may cause me to make a different determination on how we proceed. Do you want to talk to your client for a minute?

[Counsel:] Yes, please.

After conferring with counsel privately, Siders confirmed to the trial court, under oath, that he wished to proceed with the trial. The trial court gave the omitted instruction to the jury the morning after this record was made.

Siders testified on his own behalf that he only followed the white vehicle from the Shady Lady to get its license plate information. Siders testified that it was not he who fired the shots at Victim's car, but the occupant in the back seat of his car, who had since passed away.

The jury found Siders guilty of all remaining counts, but to second-degree murder instead of first-degree murder. When the prosecutor filed the written dismissal of the charges it had previously voluntarily dismissed after the trial court's suppression of the evidence found at the time of Siders's arrest, it also inadvertently dismissed the count of

6

unlawful possession of a weapon for the firearm found in Siders's residence. Siders was sentenced to thirty years for second degree murder, fifteen years for unlawful use of a weapon, and five years for each count of armed criminal action, with all sentences to be served concurrently. This appeal follows.

## Evidence from search warrant

Siders's first point on appeal is that the trial court erred when it denied his motion to suppress the gun found in his residence during execution of the search warrant. Siders maintains that the warrant was obtained using an affidavit that included information that was obtained during Siders's unlawful arrest, and that without this improperly obtained information, there was not probable cause to support the issuance of the search warrant for his residence.

### *Standard of Review:*

Our review of a trial court's "decision concerning a motion to suppress evidence is limited to a determination of whether there is substantial evidence to support its decision." *State v. Eshnaur*, 106 S.W.3d 571, 574 (Mo. App. W.D. 2003) (internal quotation omitted). We will reverse the trial court's judgment only when it is clearly erroneous. *State v. Bell*, 488 S.W.3d 228, 238 (Mo. App. E.D. 2016). When the evidence was obtained by execution of a search warrant, we give great deference to the initial judicial determination that probable cause supported the issuance of the warrant. *State v. Wilson*, 404 S.W.3d 917, 919 (Mo. App. S.D. 2013). We reverse only when the determination that probable cause existed was clearly erroneous. *Id.* "We will consider

7

all evidence presented at trial as well as evidence presented at a pre-trial hearing on the motion to suppress." *State v. Norman*, 431 S.W.3d 563, 568 (Mo. App. E.D. 2014).

*Analysis:*

The trial court agreed with Siders that his arrest was not based upon probable cause and that, therefore, the evidence seized upon his arrest could neither be used at his trial, nor could it be used to support a finding of probable cause for the issuance of the subsequent search warrant. The trial court pointed out, however, that the inclusion of illegally obtained evidence in the affidavit would not defeat the validity of the warrant so long as, "setting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause." *See State v. Oliver*, 293 S.W.3d 437, 443 (Mo. banc 2009). The trial court concluded that the affidavit stated sufficient independent and lawfully obtained information to support the finding of probable cause.

We agree with the trial court that sufficient independent and lawfully obtained information supported probable cause to issue the search warrant on Siders's residence. The affidavit stated that the security video from the Shady Lady at the time of the shooting shows a vehicle matching Siders's vehicle being driven by a black male. The shooting at the Shady Lady was reported at 2:39 a.m. Other surveillance video shows Siders's vehicle speeding and overtaking the Victim's vehicle. Victim's vehicle swerved and struck a guard rail before coming to a stop off of the highway. Victim's accident was reported at 3:06 a.m. Upon arrival, officers discovered Victim was covered in blood from an apparent gunshot wound. The driver's side window and the rear passenger's side window were broken. Holes in the passenger's side headrest were consistent with bullet

8

holes. A video from a nearby business contains the sounds of two gun shots and then shows Siders's vehicle exiting the highway and continuing at a high rate of speed on Truman Road. Multiple cameras track Siders's vehicle continuing down Truman Road, including that from license plate reading cameras. The license plate for the vehicle was registered to a Kia Optima owned by Siders. The address for the vehicle registration was in Independence, Missouri.

Bullet casings recovered from the highway at Victim's murder scene were head stamped "FC 9 mm Ruger." Bullet casings recovered from the Shady Lady parking lot also had a head stamp of "FC 9 mm Ruger." The crime lab determined the bullet casings at each location had been fired from the same gun.

In the afternoon on the day of the shooting, officers surveilling the residence in Independence, Missouri observed Siders, of whom they had obtained a driver's license photo, drive the Kia Optima with the identified license plates up to the residence and go inside. A short time later, Siders exited the residence and was placed under arrest. The trial court determined that at this point in time, officers did not have probable cause to arrest Siders because they did not have evidence that Siders was in fact the shooter, only that a black male driver of the car owned by Siders was involved in the shooting.[3]

However, even if, at that time, there was not probable cause to establish that Siders was the shooter, there was probable cause that the shooting occurred from Siders's

_____

[3] Whether or not the arrest was invalid or the evidence seized from the search of Siders's person at the time of the arrest should have been suppressed is not before us and we offer no opinion on that ruling.

9

vehicle, which was located at his residence within hours of the shooting; he exited the vehicle and entered his residence before leaving a short time later, therefore, there was a fair probability that evidence of the crime, including ammunition of the type used in the shootings, may be found in Siders's residence. *See Wilson*, 404 S.W.3d at 921 ("Probable cause means that there is a fair probability that evidence of a crime will be found at the location of the search."). The only information in the search warrant application that was obtained from the search of Siders's person at the time of his arrest was that he was found to be in possession of two handguns, one of which was a 9 mm, and that he had a large quantity of cash when searched.

Even if the warrant affidavit had failed to contain independent properly obtained information to support the search warrant, exclusion of evidence obtained pursuant to a search warrant executed in good faith may still be admitted at trial. *State v. Robinson*, 454 S.W.3d 428, 437 (Mo. App. W.D. 2015) (citing *United States v. Leon*, 468 U.S. 897 (1984)). The rationale for the good-faith exception to the exclusionary rule is that "the marginal or non-existent [deterrent] benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial cost of exclusion." *Leon*, 468 U.S. at 922.

The *Leon* good-faith exception to the exclusionary rule will not apply, and suppression remains appropriate if:

> (1) the affiant provides information he knows or reasonably should know is false; (2) the magistrate or judge wholly abandons his or her judicial role; (3) the affidavit is so lacking in probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient the executing officers cannot reasonably presume it to be valid.

*Robinson*, 454 S.W.3d at 442 (footnote and internal quotation omitted). While we find that the search warrant was supported by probable cause based on properly obtained information contained in the affidavit, even if it was not supported by probable cause, it would have been a close enough case that, without further allegations of bad faith, none of the exceptions to *Leon* enumerated above would apply to justify suppression of the evidence seized from the residence. The trial court did not err in denying the motion to suppress the evidence seized from the residence.

Point I is denied.

### Omitted Jury Instruction

Siders's second point on appeal is that the trial court plainly erred in failing to read to the jury MAI-CR4th 400.06 before the commencement of the presentation of evidence at trial. We do not address this claim substantively because Siders affirmatively waived this issue at trial.

Siders acknowledges that this alleged error was not preserved at trial and requests plain error review pursuant to Rule 30.20.[4] We decline. "[P]lain error review is discretionary, and this Court will not use plain error to impose a *sua sponte* duty on the trial court to correct Defendant's invited errors." *State v. Brandolese*, 601 S.W.3d 519, 531 (Mo. banc 2020) (internal quotation omitted).

In this case, the trial court realized its error in not reading the mandatory instruction to the jury at the outset of the trial. It noted the critical nature of the error and

---

[4] All rule references are to the Missouri Supreme Court Rules (2024).

11

its presumed prejudicial effect and immediately offered Siders the opportunity to make any necessary motions including, presumably, a motion for a mistrial. Siders's counsel repeatedly and affirmatively refused to request any relief and stated that Siders wished to proceed with this trial. Unwilling to accept Counsel's assurances, the trial court allowed Siders to confer with counsel and then had Siders testify under oath outside of the presence of the jury to make a record that he shared Counsel's desire to waive any error and proceed with the trial. The trial court then did read the instruction to the jury. "A defendant cannot affirmatively accept a judge's proposed action [or his counsel's] in the hope of a strategic advantage; then, turn 180 degrees and urge an appellate court to find the trial court plainly erred in doing that to which the defendant originally agreed." *State v. Winters*, 623 S.W.3d 746, 754 (Mo. App. W.D. 2021). In this case, Siders went beyond accepting the proposed action, he affirmatively and under oath insisted on it. It is difficult to imagine how the trial court could have made this any clearer in the record, and we do not impose upon the trial court the duty to *sua sponte* order a mistrial when Siders and his counsel clearly believed it was better for them to take their chances at the trial in progress. We conclude that even plain error review was waived in this case.

Point II is denied.

## Conclusion

For the above-stated reasons, we affirm the judgment of the trial court.

_____
Gary D. Witt, Judge

All concur